NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2739-13T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

BRANDON KANE,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

March 3, 2017

APPELLATE DIVISION

Argued June 8, 2016 — Decided  March 3, 2017

Before Judges Ostrer, Haas and Manahan.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 11-03-0448.

Michele E. Friedman, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Jason A. Coe, Assistant Deputy Public Defender, of counsel and on the briefs).

Mary R. Juliano, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Acting Monmouth County Prosecutor, attorney; Ms. Juliano, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

A jury found defendant Brandon Kane guilty of second-degree serious bodily injury aggravated assault of M.K. (Marjie),[1] N.J.S.A. 2C:12-1(b)(1); second-degree kidnapping of Marjie, as a lesser-included offense of first-degree kidnapping, N.J.S.A. 2C:13-1(b); third-degree terroristic threats of Marjie, N.J.S.A. 2C:12-3; third-degree significant bodily injury aggravated assault of C.H. (Charlie), N.J.S.A. 2C:12-1(b)(1);[2] and fourth-degree criminal trespass of Charlie's home, N.J.S.A. 2C:18-3(a), as a lesser-included offense of second-degree burglary, N.J.S.A. 2C:18-2. The jury acquitted defendant of first-degree attempted murder of Marjie, N.J.S.A. 2C:5-1, N.J.S.A. 2C:11-3.

Defendant raises four arguments on appeal. First, he challenges the court's denial of his motion to compel production of Marjie's pre-assault medical and mental health treatment records. Second, he claims that several instances of prosecutorial misconduct deprived him of a fair trial. Third, he argues there was plain error in the jury instruction. Last, he challenges the court's weighing of aggravating and mitigating factors in imposing an aggregate sentence of seven years subject

---

[1] Out of respect for their privacy, we use initials and pseudonyms for the victims.

[2] After the close of the State's case, the court reduced the original second-degree charge related to the assault of Charlie to a third-degree aggravated assault.

to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.  Having considered defendant's arguments in light of the record and applicable principles of law, we affirm.

I.

The offenses occurred during and after a party at Charlie's house on the evening of October 18, 2010, and in the early morning hours the next day.  The State presented eyewitness testimony from party attendees and two neighbors; State Troopers, including those who discovered the victims and arrested defendant; physicians who treated Marjie; and an expert witness who rebutted defendant's defense of temporary insanity. Defendant called his father, one eyewitness, and two experts in support of his insanity defense.  Although defendant did not testify, the jury heard his Mirandized statement to police.

Defendant and Marjie had been dating for almost a year when they celebrated her twenty-first birthday on October 18.  The celebration, which involved significant drinking, was an all-day affair that ended at Charlie's house around 11 p.m.  Present along with Charlie were his girlfriend and another couple.  The group consumed shots of whiskey, although Marjie denied drinking at Charlie's house.  Marjie admitted she was still tipsy from before, however.

The mood was initially festive, but changed after the conversation turned to defendant's appearance. He was a body-builder who had injected himself with anabolic steroids. He weighed roughly 250 pounds. One person likened defendant to the Hulk while the group was gathered. Defendant then grabbed a refrigerator and smashed his head into it repeatedly. As a result of the bizarre act, Charlie got upset and told defendant to calm down.

The altercation apparently disturbed defendant, who walked into the living room. Marjie followed. She asked him if he was okay and tried to hug him. He head-butted her, knocking her to the floor and causing a cut under her eye. He then picked her up and instructed her "to stop crying" and mend her face.

Upon learning what defendant had done, the other two women scolded defendant. Defendant became enraged that Marjie had disclosed he struck her. He told Marjie their relationship was over if she did not leave with him. He also threatened to kill her if she stayed. But she refused to obey his orders. Instead, defendant was told to leave and, eventually, after a violent confrontation with Charlie outside, he complied.

However, less than an hour later, he returned. Charlie and his girlfriend were arguing near a door to the house. Defendant, who had earlier accused Charlie of "making out" with

Marjie, approached Charlie and punched him in the face, fracturing his nose and knocking him unconscious.

Defendant located Marjie on the living room floor. She told him she was trying to sleep, but he did not believe her. She testified he grabbed her by the hair and dragged her out of the house, shoeless and coatless. Another one of the party-goers, who had passed out on a nearby sofa, testified for the defense that he awoke to observe defendant and Marjie yelling, cursing and arguing. But he stated that defendant did not drag Marjie out of the house by her hair.[3]

Marjie did not weigh much over one hundred pounds. She testified that defendant pulled her up the street. When she lost her footing, he simply dragged her along. She kept telling him to let her go. Marjie testified that he repeatedly told her he was going to kill her, and asked, "How does it feel knowing it's your last day to live?" When she tried to break free of his grip, he lifted her by her hair and punched her at least twice in the face, close-fisted. She blacked out. When she awoke, she felt her face gushing blood. He took her to a park

---

[3] The witness's credibility was questionable. He admitted that his trial testimony was at odds with his statement to police shortly after the event. He also testified he had been drinking steadily since the early evening, consuming multiple beers, four or five shots of whiskey, and painkillers. He did not observe defendant hit the refrigerator, head-butt Marjie, or punch Charlie. He also admitted he had been a friend of defendant.

and threw her down to the ground. While again threatening her with death, he kicked, punched, and choked her until she lost consciousness again.

When she awoke a second time, defendant was cradling her head as she lay in the field, repeating he was sorry. He asked her if she was unfaithful to him. He tried to convince her to make up a story about how she was injured. She said she needed medical attention, but he did not call 911. Instead, he decided to take her back to his house. She begged him to take her to Charlie's house while they were en route, which he did. After checking to see if anyone was present, he carried Marjie up to a bathroom and tried to clean her up.

State Troopers then entered the house. They had been called by two of Charlie's neighbors, who had independently come to suspect something was awry. As one neighbor headed home, he noticed the altercation between defendant and Charlie outside Charlie's house. His wife later heard Charlie's girlfriend screaming after discovering Marjie was missing from the home. The responding police searched unsuccessfully for defendant — they interviewed defendant's father and went to the park — only to find defendant after he returned to the house with Marjie.

The troopers found defendant standing in the bathroom as Marjie lay curled on the floor of the shower. She was bleeding

profusely.  Her eyes were swollen shut.  A piece of her lip had been ripped or bitten off.  She had a fist mark on her forehead, marks on her neck, and "road rash" on her leg.  Physicians later testified she suffered a concussion.  As of the trial in 2013, she still suffered from migraines, vertigo, and post-traumatic stress disorder (PTSD) related to her head injury.  Troopers also found Charlie in a nearby bedroom.  He could not explain how he got there from the kitchen, where he had been knocked out.

Defendant told the troopers that Marjie simply fell, but the police were not persuaded and arrested him.  Initially, Marjie also claimed her injuries were from a fall.  But once the police officers assured her that defendant was in custody, she told them how he had assaulted her.

In a recorded Mirandized statement, defendant denied assaulting anyone at any point during the evening.  He denied he struck the refrigerator.  He claimed he left the house only to retrieve his phone charger.  He stated that when he returned to the house, he found Marjie curled up on the living room floor, screaming, with head and facial injuries.  He denied he blacked out at any time.  He also denied that he had taken steroids or other drugs.

Defendant filed two pretrial motions to compel the State to produce records of Marjie's mental health treatment, drug and alcohol rehabilitation and counseling, drug prescriptions, and hospitalization and treatment for an alleged suicide attempt in 2010.[4] The court denied the first motion without prejudice. The court concluded that defendant failed to demonstrate the need or relevance of the records.

A different judge denied the second motion several months later. Relying on N.J.R.E. 505 and N.J.R.E. 506, the court found the requested documents were privileged and defendant failed to satisfy the test for piercing the privilege as set forth in In re Kozlov, 79 N.J. 232 (1979), and restated in Kinsella v. Kinsella, 150 N.J. 276 (1997). The court rejected the argument the documents were needed to challenge Marjie's credibility, questioning whether her credibility was at issue and whether the documents would be relevant to undermining it.

At trial, defense counsel conceded that defendant punched Charlie, head-butted Marjie, and struck her again in the park. The crux of the defense was a claim of temporary insanity. Defendant offered evidence that he suffered from PTSD arising out of an incident four years earlier in which he was stabbed

---

[4] Defendant also sought records of any toxicology tests performed at the hospital after the assault, but the parties ultimately agreed none existed.

repeatedly. His expert witness contended that he committed the assaults in the midst of a "disassociative state" triggered by the PTSD and influenced by alcohol and drugs. As a result, he was "acting as if . . . on automatic pilot . . . in more of a reflexive manner."

Defense counsel also challenged the kidnapping charge, contending Marjie voluntarily left the house with defendant, and the burglary charge associated with his entry over Charlie's objection. He also argued the State overcharged defendant by alleging attempted murder.

The State's rebuttal expert found "no evidence that Brandon was psychotic before, during, or following the offense" or that he "didn't know what he was doing." Rather, he "struck the person he was angry at." Using the language of N.J.S.A. 2C:4-1, he opined defendant's actions demonstrated that he understood the "nature and quality" of his acts and knew that "what he was doing was wrong."

Following the verdict, the court denied defendant's motion for a new trial. At the sentencing hearing, the court found that aggravating factors three (risk of re-offending), six (extent of prior criminal record), and nine (need to deter) outweighed mitigating factor eight (conduct the result of circumstances unlikely to recur). N.J.S.A. 2C:44-1(a)(3), (6),

(9); N.J.S.A. 2C:44-1(b)(8). The court noted that defendant's steroid use and intoxication contributed to his violent behavior, but did not find mitigating factor four (substantial grounds tending to excuse or justify conduct), despite defendant's request that it do so. See N.J.S.A. 2C:44-1(b)(4).

The court sentenced defendant to concurrent seven-year terms on the second-degree kidnapping and aggravated assault of Marjie, with eighty-five percent parole disqualifiers and three-year periods of parole supervision under NERA, N.J.S.A. 2C:43-7.2. The court imposed a concurrent four-year term on the third-degree aggravated assault of Charlie, and merged the criminal trespass and terroristic threat counts into the remaining counts.

Defendant presents the following points on appeal:

POINT I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S DISCOVERY MOTIONS BECAUSE THERE WAS A REASONABLE PROBABILITY THAT THE MATERIALS SOUGHT WOULD LEAD TO RELEVANT EVIDENCE; IT WAS FURTHERMORE A VIOLATION OF DEFENDANT'S CONFRONTATION RIGHT WHEN THE TRIAL COURT PREVENTED DEFENSE COUNSEL FROM CROSS-EXAMINING THE VICTIM AS TO POSSIBLE USE OF PRESCRIPTION DRUGS. (raised below).

POINT II

MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT, INCLUDING UNSUBSTANTIATED ACCUSATIONS AGAINST THE DEFENDANT OF WITNESS

A-2739-13T2

TAMPERING IN THE PRESENCE OF THE JURY, REQUIRE REVERSAL.  (partially raised below).

A.    The State Improperly Impeached A Defense Witness By Reference To An Unsubstantiated Allegation Of Witness Tampering In Front Of The Jury.

B.    The State's Opening And Closing Statements Contained Improper Inflammatory Appeals To The Jurors' Emotions.

C.    The State Improperly Exalted The Prosecution's Position As The Representative Of The State Of New Jersey To Lend Credibility To Its Theory Of The Case.

D.    The Prosecutor Improperly Vouched For The State's Case By Expressing A Personal Belief In The Validity Of The Charges In The Indictment.

E.    The State Improperly Denigrated The Defendant's Mental Health Defense.

F.    The Cumulative Effect Of The Prosecutorial Misconduct That Appears In The Record Was Clearly Capable Of Producing An Unjust Result And Therefore Requires Reversal.

POINT III

BECAUSE THE STATE CHARGED MULTIPLE ACTS IN A SINGLE COUNT OF THE INDICTMENT, THERE WAS A REAL DANGER OF A FRAGMENTED VERDICT, THUS NECESSITATING A SPECIFIC UNANIMITY INSTRUCTION.  (not raised below).

POINT IV

DEFENDANT'S SEVEN-YEAR NERA SENTENCE FOR HIS FIRST INDICTABLE OFFENSE WAS BOTH EXCESSIVE AND PROCEDURALLY FLAWED.

11                              A-2739-13T2

Defendant argues that the court erred in twice denying his motion to compel disclosure of Marjie's medical, mental health, and rehabilitation records. We review the trial court's discovery ruling for an abuse of discretion. State v. Broom-Smith, 406 N.J. Super. 228, 239 (App. Div. 2009), aff'd, 201 N.J. 229 (2010). We discern none.

A.

Before reaching the issue of privilege, we note that defendant failed to meet his heavy burden to secure discovery not mandated by Rule 3:13-3. It also appears he failed to provide notice of his motion to Marjie, the alleged victim. As these shortcomings implicate important issues concerning the confidentiality rights of third party crime victims, we discuss them separately.

Our criminal discovery rules do not oblige the State to produce reports of mental examinations or experiments unless they are within its "possession, custody, or control." R. 3:13-3(b)(1)(C); see State v. Robertson, 438 N.J. Super. 47, 68-69 (App. Div. 2014), certif. granted on other grounds, 221 N.J. 287 (2015). There is no evidence the State possessed the various records defendant sought. "[E]vidence in the control of a crime victim — notwithstanding the victim's close cooperation with the

prosecution — is not within the prosecutor's 'possession, custody or control.'" Id. at 69 (citation omitted). Likewise, the State's disclosure obligations under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), do not extend to documents in a private third-party's possession. Robertson, supra, 438 N.J. Super. at 69.

A court may exercise its inherent power to order discovery outside the court rule, but the defendant bears the burden of establishing need. State ex rel. A.B., 219 N.J. 542, 555 (2014). That burden is specifically calibrated to the "nature and extent of the intrusion" into the discovery target's rights. Id. at 556-57. In the case of a compelled psychological or physical examination of a victim, the burden is a heavy one. Even absent an issue of privilege, the defendant must satisfy a "heightened standard of substantial need" to justify the "extraordinary intrusions into an alleged victim's mind and body" and resulting emotional trauma and distress to the alleged victim. Id. at 561; State v. D.R.H., 127 N.J. 249, 256-67 (1992); see also State v. Gomez, 430 N.J. Super. 175, 184 (App. Div. 2013) (stating discovery is only appropriate when the requestor's right "clearly outweighs the victim's . . . rights with respect to the specific discovery sought and its purpose"); N.J.S.A. 52:4B-36(c) (crime victims shall be "free from

13

intimidation, harassment or abuse" by the defendant). A victim's pre-existing mental health records deserve comparable protection.

Nor is there evidence that defendant served the motions on Marjie. Although neither party addressed the issue, we seriously doubt the court may compel the production of a victim's mental health records without affording her notice and an opportunity to be heard. Cf. A.B., supra, 219 N.J. at 564, 550 (noting that the parents of juvenile-victim were given notice of alleged offender's request to inspect their home, and the court considered an opposing certification from the victim's mother on reconsideration); D.R.H., supra, 127 N.J. at 254-55, 261 (noting written submissions to the court by father of alleged child sex-assault victim and the victim herself, opposing defendant's application for a physical examination of the child); Crescenzo v. Crane, 350 N.J. Super. 531, 543 (App. Div.) (noting that Rule 4:14-7(c) governing third-party discovery is designed to afford interested parties an opportunity to test the right to disclosure), certif. denied, 174 N.J. 364 (2002).[5]

---

[5] Had defendant sought the records through a trial subpoena duces tecum, Marjie would have been on notice of the request and had an opportunity to file a motion to quash. See State v. Cooper,

(continued)

We recognize the prosecutor sought to protect Marjie's privilege by resisting the motion. Yet, the prosecutor represents the State, not Marjie. The privilege belongs to her. She possessed or controlled the records and had the greatest interest in their confidentiality. Furthermore, an order compelling discovery would presumably have been directed to her, not the State. See A.B., supra, 219 N.J. at 564 n.4 (stating that discovery order — in that case, to inspect victim's home — may be submitted to the alleged victim as opposed to the prosecutor's office).

Although a victim may be content to rely on the State's opposition, she should be afforded the option to advocate separately for preserving her privilege. As a crime victim, she was entitled "[t]o appear in any court before which a proceeding implicating the rights of the victim is being held." N.J.S.A. 52:4B-36(r). This included, in our view, the right to appear to oppose the motion seeking her records.[6]

---

(continued)
2 N.J. 540, 556-57 (1949); In re Application of Attorney General, 116 N.J. Super. 143, 147 (Ch. Div. 1971).

[6] The full text of section (r) entitles a victim:

> To appear in any court before which a proceeding implicating the rights of the victim is being held, with standing to file a motion or present argument on a motion

(continued)

A-2739-13T2

B.

As a substantive matter, the documents sought were privileged and/or confidential. Although the record does not reflect what kind of mental health professional, if any, Marjie actually consulted, we presume one or more privileges applied. See N.J.R.E. 505 (psychologist-patient privilege); N.J.R.E. 506 (physician-patient privilege, including psychiatrist-patient privilege); N.J.R.E. 510 (marriage counselor privilege); N.J.R.E. 518 (social worker privilege); N.J.S.A. 45:8B-49 (licensed professional counselor privilege); N.J.A.C. 13:34C-4.5 (alcohol and drug counselor privilege).[7] Defendant does not rely

---

(continued)
> filed to enforce any right conferred herein or by Article I, paragraph 22 of the New Jersey Constitution, and to receive an adjudicative decision by the court on any such motion.
>
> [N.J.S.A. 52:4B-36(r).]

Although the provision grants a victim standing to affirmatively seek enforcement of her victim rights, we do not read the standing grant so restrictively as to preclude standing to oppose efforts to undermine those rights.

[7] Prior to the adoption of the uniform privilege governing mental health service providers, N.J.R.E. 534 (effective July 1, 2016), the standards governing the privileges varied. See, e.g., State v. McBride, 213 N.J. Super. 255, 270 (App. Div. 1986) (recognizing that "the psychologist-patient privilege affords even greater confidentiality than the physician-patient privilege"), certif. denied, 107 N.J. 118 (1987).

on an explicit exception to a privilege, and he has failed to justify piercing these privileges.

A court is required to "give as much effect as possible to the legislative judgments embodied in the privileges within ever-present constitutional limitations." State v. Mauti, 208 N.J. 519, 537 (2012) (internal quotation marks and citation omitted). The Court recognized that Kozlov created a three-prong test for piercing a privilege. Id. at 537. Kozlov held that a privilege may be pierced upon a showing that: (1) the party has "a legitimate need . . . to reach the evidence sought to be shielded"; (2) the evidence is relevant and material to an issue before the court; and (3) the evidence could not be secured from a less intrusive source. Kozlov, supra, 79 N.J. at 243-44.

But the Supreme Court cautioned in Mauti that Kozlov did not create a "broad equitable balancing test pursuant to which any privilege is subject to piercing if the adversary 'needs' relevant evidence that cannot be obtained from another source." Mauti, supra, 208 N.J. at 537. Rather, "only in the most narrow of circumstances, such as where a privilege is in conflict with a defendant's right to a constitutionally guaranteed fair trial, would the need prong of its test be satisfied." Id. at 538.

Furthermore, the constitutional right to confrontation upon which defendant relies is not unqualified. See State v. Gilchrist, 381 N.J. Super. 138, 144 (App. Div. 2005) (stating the right to confront one's accusers "does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony" (internal quotation marks and citations omitted)). The confrontation right may be balanced against a compelling State interest, such as the interest in maintaining the confidentiality of certain records. In re Z.W., 408 N.J. Super. 535, 539 (App. Div. 2009) (citing Pennsylvania v. Ritchie, 480 U.S. 39, 59-61, 107 S. Ct. 989, 1002-03, 94 L. Ed. 2d 40, 58-60 (1987)); see also In re Maraziti, 233 N.J. Super. 488, 498-500 (App. Div. 1989) (finding that the Due Process Clause did not compel disclosure of communications protected by the attorney-client privilege where alternative sources of information regarding the victim's credibility were available).

A defendant may not "turn the discovery process into a fishing expedition." Broom-Smith, supra, 406 N.J. Super. at 239.[8] Defendant contends records of Marjie's alleged "sensory

---

[8] Defendant's assault of Marjie was an act of domestic violence as they were in a long-standing dating relationship. See N.J.S.A. 2C:25-19. A court must also guard against allowing the
(continued)

and mental defects[] and her potential drug use" were essential to challenge her "ability to perceive effects and relate them accurately." We disagree. There was no preliminary showing — despite the fact that defendant was involved in a close relationship with Marjie for almost a year — that she suffered from a mental or neurological condition that affected her ability to perceive, recall or relate.

This case is unlike <u>Velazquez v. City of Camden</u>, 447 <u>N.J. Super.</u> 224, 244-45 (App. Div.), <u>certif. denied</u>, ___ <u>N.J.</u> ___ (2016), where we allowed a civil rights plaintiff to introduce evidence of the defendant police officer's sleep disturbances, anxiety, and difficulties concentrating and functioning because they related to the credibility of his testimony concerning what he had observed.[9] Notably, in <u>Velazquez</u>, the value of the witness's testimony turned on a fine, detailed observation — namely the size and placement of a rock thrown by the suspect whom the defendant shot. <u>Id.</u> at 245. The court found the witness's neurological state was directly relevant to his

_____

(continued)
discovery process to be used as a means to harass or embarrass a victim. <u>See</u> <u>N.J.S.A.</u> 52:4B-36(c).

[9] We note that the appellate panel in <u>Velazquez</u> analyzed the relevance of the information to the issue of the officer's ability to accurately perceive events. It did not address whether the evidence's probative value justified piercing the psychologist-patient privilege.

credibility.  Ibid.  The present matter, by contrast, involves no such minutia; instead, defendant seeks to impeach Marjie's observation that she was dragged out of Charlie's house by her hair.  No showing has been made that additional evidence of substance abuse or mental health disorders would impeach her ability to perceive and recall such an event.[10]

Although defendant refers to Marjie as the "complaining witness," we also find no basis to conclude she waived her privilege.  Cf. Mauti, supra, 208 N.J. at 538-39 (stating that to pierce the privilege a defendant must show that "a constitutional right is at stake[] or . . . a party has explicitly or implicitly waived the privilege").  Marjie is a crime victim.  That does not make her a party to this case, nor would it be accurate to say the State is "claiming through" a crime victim when it prosecutes a case.  Cf. N.J.R.E. 506(d) (stating there is no physician-patient privilege where patient's condition "is an element or factor of the claim or defense of

---

[10] Notwithstanding one party-goer's testimony that defendant did not drag Marjie out by her hair, there was significant evidence, in addition to Marjie's testimony, that she was removed against her will.  This included evidence that she left the house without even taking the time to put on shoes or a jacket; she went with a man who had already struck her once in the head and threatened to kill her; and the "road rash" on her left leg, indicating she had been dragged.

the patient or of any party claiming through or under the patient").

We have previously addressed, without deciding, the question whether, by signing a criminal complaint, a victim implicitly waived her privilege "at least insofar as [concerned] the diagnosis of her mental condition" that the defendant allegedly caused. See State v. McBride, 213 N.J. Super. 255, 270-71 (App. Div. 1986), certif. denied, 107 N.J. 118 (1987). Yet, there is no evidence Marjie signed a criminal complaint, nor does she allege a mental condition that defendant caused. Furthermore, the court in McBride determined that since the State placed in evidence the victim's own mental and neurological condition, it would be unfair to deprive the jury of information that would enable it to appraise the accuracy of the diagnosis. See Id. at 262, 269-72. The State has made no similar effort to place Marjie's mental health in issue in this case.

Defendant also contends it was reversible error for the court to preclude cross-examination about whether Marjie had used oxycodone in the past, after she denied using it the night of the assault. Evidence of habitual drug use is rarely admissible to establish drug use on a particular day. State v. Wormley, 305 N.J. Super. 57, 65 (App. Div. 1997), certif.

21                                                          A-2739-13T2

denied, 154 N.J. 607 (1998). We found harmful error when the court barred inquiry into a victim's drug usage in Wormley. Id. at 64-68. However, in that case, there were serious gaps and inconsistencies in the victim's reported observations of the crime. Id. at 67-68. Defendant has failed to establish a similar predicate for exploring Marjie's past drug use in this case.

In sum, the court did not err in barring discovery of Marjie's mental health and medical records, and restricting cross-examination of past drug use.

### III.

Defendant raises several instances of prosecutorial misconduct that he claims, either individually or as a whole, deprived him of a fair trial. Only one claim of error warrants discussion. It pertains to the State's cross-examination of the party-goer who testified that defendant did not drag Marjie out of the house by her hair. The questioning implied that the witness had changed his testimony at the request of another person:

> Q. Now, since that point, since that incident, you've been — I guess you've received letters or you heard about people — witnesses in the case receiving letters, correct?

> A. No.

A-2739-13T2

Q. You didn't hear about any letters being sent out asking people to change their version of the story?

[DEFENSE ATTORNEY]: Objection.

The judge then excused the jury and asked the prosecutor for an offer of proof.

[ASSISTANT PROSECUTOR]: Judge, we were told through another witness . . . as well as this witness [last month] . . . that there was, in fact, a letter sent to him asking him to change his story.

THE COURT: From who?

[ASSISTANT PROSECUTOR]: This . . . witness couldn't say for certain. He said it was sent to him from — what I believe from MCCI.

THE WITNESS: No.

THE COURT: Do you have the letter?

[ASSISTANT PROSECUTOR]: We don't have a copy of the letter. It was never sent to us.

THE COURT: So you ask a question that you don't have an offer of proof to substantiate?

[ASSISTANT PROSECUTOR]: Judge, it's a good faith basis for us that we have through defense counsel's own witness telling us this.

THE WITNESS: I never said that.

The court found that the prosecutor lacked a sufficient basis to make this inquiry and sustained the objection. When

23

the jury reentered, the judge instructed, "Folks, I have sustained the last objection. So the last question that was posed to the witness will be disregarded by you."

Prosecutorial misconduct may be grounds for reversal where the misconduct "was so egregious that it deprived the defendant of a fair trial." State v. Frost, 158 N.J. 76, 83 (1999). "[T]o warrant a new trial the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced [a] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Smith, 167 N.J. 158, 181-82 (2001) (internal quotation marks and citation omitted). In making this assessment, a reviewing court "must consider (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Frost, supra, 158 N.J. at 83.

As a threshold matter, we are not convinced the prosecutor's question was improper. "[A] question in cross-examination is improper where 'no facts concerning the event on which the question was based were in evidence and the [questioner] made no proffer indicating his ability to prove the occurrence.'" Manata v. Pereira, 436 N.J. Super. 330, 348 (App.

Div. 2014) (quoting State v. Rose, 112 N.J. 454, 500 (1988)). In order to have a good faith basis to inquire about the alleged letter, the State was not necessarily required to produce the letter itself, provided the State presented other proof of its existence.

However, even assuming the question was improper, it did not constitute egregious misconduct warranting a new trial. See Frost, supra, 158 N.J. at 83. The question was vague. It did not identify the purported sender of the letter, nor its substance. Furthermore, after defense counsel objected, the judge swiftly and emphatically instructed the jury to disregard the question. We presume the jury followed those instructions. State v. Loftin, 146 N.J. 295, 390 (1996).

Defendant's remaining claims of prosecutorial misconduct pertain to remarks in the prosecutor's opening and closing statements. We note that defense counsel did not object to these remarks. "Generally, if no objection was made to the improper remarks," they "will not be deemed prejudicial." Frost, supra, 158 N.J. at 83. Having reviewed the statements carefully, we are unconvinced that there was error, let alone plain error, warranting a new trial. Any further discussion is not warranted. R. 2:11-3(e)(2).

Defendant submits, as plain error, that a "specific unanimity charge" was required for the second-degree charge of serious bodily injury aggravated assault of Marjie. Defendant contends the jury may have reached a fragmented verdict because the State presented evidence of two distinct assaults: the head-butting and the attack in the park. Furthermore, the jury could have been divided as to whether defendant was in a disassociative state during one assault. We are unconvinced.

"[I]n cases where there is a danger of a fragmented verdict the trial court must upon request offer a specific unanimity instruction." State v. Frisby, 174 N.J. 583, 597-98 (2002) (internal quotation marks and citation omitted). When the request is not made, as in this case, we must determine whether the absence of a specific unanimity charge "was clearly capable of producing an unjust result." Id. at 598 (citing R. 2:10-2). The Court found such plain error in Frisby, because the State offered "[d]ifferent theories . . . based on different acts and entirely different evidence" in support of the same charge. Id. at 599-600.

Nothing of the kind occurred in this case. The State presented evidence of a continuum of violence during the evening. Defendant did not dispute that the physical attacks

occurred. Furthermore, defendant inflicted the most serious harm in the park, when he tore away Marjie's lip, inflicted multiple blows to her head, and twice rendered her unconscious. We perceive no realistic possibility that a minority of jurors was willing to ground a second-degree assault conviction solely on the head-butting incident. Rather, in order to find defendant guilty of serious bodily injury aggravated assault, the jurors must have been unanimous that defendant also committed the attack in the park, and that he did so purposefully or knowingly and not while in a disassociative state that deprived him of the ability to know the "nature and quality" of what he was doing or to "know that what he was doing was wrong." N.J.S.A. 2C:4-1.

Finally, we discern no merit in defendant's challenge to his sentence. The court's findings of fact regarding aggravating and mitigating factors were supported by evidence in the record; the court correctly applied the sentencing guidelines; and the court did not abuse its discretion in imposing its sentence. State v. Cassady, 198 N.J. 165, 180-81 (2009); State v. Roth, 95 N.J. 334, 364-66 (1984). The court addressed the factors under State v. Yarbough, 100 N.J. 627, 643-45 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986), in deciding to impose concurrent

sentences, despite the fact that defendant assaulted two victims and committed crimes in two separate places. We are also satisfied the court fairly considered, and rejected, defendant's argument that mitigating factor four should be considered. We shall not disturb that finding.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2739-13T2