# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1216-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

E.E.,

     Defendant-Appellant.

_____

> Argued April 29, 2024 – Decided May 8, 2024
>
> Before Judges Mawla, Marczyk, and Chase.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 21-03-0277.
>
> Michael James Confusione argued the cause for appellant (Hegge & Confusione, LLC, attorneys; Michael James Confusione, of counsel and on the briefs).
>
> Sarah D. Brigham, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sarah D. Brigham, of counsel and on the brief).

PER CURIAM

Defendant E.E.[1] appeals from his convictions for: first-degree aggravated sexual assault of his daughter Delilah, N.J.S.A. 2C:14-2(a)(1), (count one); second-degree sexual assault of his niece Natalie, N.J.S.A. 2C:14-2(b), (count two); and two counts for each child of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), (counts three, four, five, and six). Defendant also challenges his sentence. We affirm.

Defendant's offenses occurred between 2011 and 2014, beginning when Delilah and Natalie were five years old. Delilah was living with her mother, older half-sister, and defendant at the time. Natalie lived nearby and frequently visited. The girls' mothers are sisters.

Delilah recalled that in 2011, defendant brought her and Natalie into his bedroom during a party at the home, pulled down their undergarments, and touched them. This was not the first time he assaulted both girls; Delilah testified she and Natalie "already knew what was going on." Delilah said defendant took turns penetrating their vaginas with his penis, keeping his hands on the other girl while he did so.

---

[1] We use initials and pseudonyms to protect the identities of the victims. N.J.S.A. 2A:82-46.

Although there were other people in the house, the bedroom door was only partially open and neither Delilah nor Natalie spoke during the assault. Delilah described the layout of the home in detail. It was a two-bedroom apartment, with one bathroom connected to the kitchen and a living room between the kitchen and bedroom. Delilah's bedroom was a walk-in-closet attached to the parents' bedroom, which was located farthest from the kitchen and towards the back of living room.

Delilah's mother testified guests would normally be in the kitchen during large gatherings because it was "the largest area of the home." Delilah explained the door to the parents' bedroom could "[n]ot necessarily" be seen from the kitchen. Given the way the bedroom was located, one could only see some drawers looking in from the living room. Defendant testified neither the parents' bed nor Delilah's room could be seen from the kitchen.

After the assault, defendant told Delilah and Natalie to clean up, and the girls complied by heading to a bathroom located next to the kitchen. This required them to walk by other adults at the party, but the adults did not notice what the girls were doing.

Natalie recalled a time when defendant sexually assaulted her at a birthday party for Delilah. She and Delilah were playing with toys in Delilah's room

A-1216-22

when defendant came in and started to rub her back and touch her buttocks, and then left.

Delilah testified about another incident involving defendant and her on the couch watching a baseball game. Defendant used a blanket to cover them, he pulled Delilah on top of him, and "pulled [her] undergarments . . . to the side, and then he started penetrating [her] vaginal area." Delilah stated he penetrated her with "[h]is penis" and it lasted "[f]or like a split minute." When her mother and older sister walked through the front door, defendant stopped moving and they did not realize what was happening because of the blanket.

Delilah's earliest memory of defendant sexually assaulting her was when she was playing with "Play-Doh of some sort" and he asked her if "[she could] do something for him." Delilah went to her parents' bed, and he laid her down on her back. Defendant pushed down her shorts and undergarments and penetrated her vagina with his penis, causing her pain.

Natalie was unsure when defendant first sexually assaulted her, but recalled a time when she was in Delilah's room. Natalie was watching TV in the living room and defendant took her by the hand and walked her into Delilah's room. Defendant then alternated calling each girl into his bedroom. Natalie testified defendant took her to the "left side of the bed[,] . . . picked [her] up and

4

put [her] on the bed," then "took off [her] clothes." Defendant kissed her "on [the] mouth," and "touch[ed her] . . . legs," and "laid her down on her back." He then "put his penis on top of [her] private area," which she clarified was her vagina, but he did not penetrate her or ejaculate. Defendant was also touching her "nipples" and it went on "[f]or like [five] minutes." Afterwards, he dressed Natalie and took her back to Delilah's room and told Delilah to come into his bedroom. Natalie reported she felt physical discomfort during the assault and, when she returned to Delilah's room, Delilah was crying.

Delilah testified defendant would sexually assault her "every few weeks." Delilah testified the pain from the penetration hurt "medium" or "minimal" at times. She explained there were "[a] number of feelings happening." She also recalled, on the way home from the park once, defendant exposed his penis, showed Delilah and Natalie how to rub it, and then had both girls touch it.

Natalie remembered an incident at the park as well, but the details she provided differed. She testified the girls were riding bikes under defendant's supervision and defendant called Natalie over and told her he planned on "tak[ing her] clothes off and . . . kiss[ing her]." Natalie recalled it being "just [them]" when defendant made the statement. She responded by making a "weird face" and returned to riding her bicycle.

Natalie also recalled an incident when she was on the living-room couch with defendant and he unbuttoned and unzipped her pants, and then pulled down his pants to his thighs, exposing his erect penis. At the time, only Delilah's mother and Delilah were home, and they were in the bedroom. Natalie testified defendant "put [her] hand over" his penis. Defendant then "started pushing [her] head" but she "put it back up." When asked how hard he pushed the back of her head, Natalie said: "[H]ard enough for me to try to . . . go down. But then . . . I got back up." Natalie testified he then pulled her pants back up and the incident ended. Not long afterwards, Natalie's mother returned, but Natalie did not say anything to her.

In or around 2016, the Division of Child Protection and Permanency (Division) initiated an investigation because Delilah took sleeping pills in an apparent suicide attempt. That investigation did not involve any allegations against defendant and resolved without reference to any sexual abuse of Delilah. The Division ultimately referred Delilah to therapy.

Around 2016 or 2017, Delilah's parents separated, and she no longer lived with defendant. Afterwards, Delilah would rarely see or communicate with defendant. She testified she did not see him at all in the first year, then "once [she] got into third grade, [she] started seeing him . . . on a weekly basis." She

recalled seeing him sometime in 2020 but could not remember when. "He would call [her] sometimes or . . . try to text [her], but [she] wouldn't really respond."

Natalie testified she did not report the abuse because she did not know "what [defendant] would do if he found out." She explained the abuse would occur "almost every time [she] saw [defendant]. . . . [E]very time [she] went to [Delilah's] house."

Delilah testified she did not discuss the assaults with Natalie or anyone else. On October 16, 2020, Delilah's half-sister found a ripped up note in Delilah's room that stated Delilah "wanted to commit suicide" and had been having suicidal thoughts since the fifth grade. The note did not mention defendant's sexual abuse. Delilah's sister asked her what was wrong and wanted to get her help.

Delilah told her sister and mother about the sexual abuse but did not tell them everything or provide details. She testified she did not tell anyone before that date partly because she "was in denial." When her mother asked if it was "just touching," Delilah said yes, but she later divulged to her mother, the Division, and the police, that defendant had also penetrated her. A Division caseworker interviewed Delilah on October 21, 2020. She was then interviewed by a Hudson County Prosecutor's Office detective on October 23, 2020.

A-1216-22

By October 2020, Natalie and her mother moved to Pennsylvania. On October 27, 2020, they drove to Hudson County to give a statement to police. When Natalie's mother asked her about the abuse during the police interview, she said defendant did not penetrate her.

Defendant testified at trial and denied touching either of the children in a sexual manner. He claimed he was never alone with them at the park and was never alone with Natalie in his home. He denied being home alone with Delilah as well and denied watching baseball alone with her. However, on cross-examination he conceded there had been times when was alone with her, but it was not the norm.

Delilah's mother testified she did not have a babysitter and she would try to coordinate her work schedule with defendant so that one of them was available to care for Delilah "[m]ost of the time." Natalie's mother testified it was not unusual for her to leave Natalie alone with defendant because "everyone was trusting him." Delilah's half-sister also testified she never suspected there was abuse happening.

Defendant testified he, Delilah, and Delilah's mother visited Natalie and her mother at their home in Pennsylvania in September 2020. He claimed he argued with both women during this trip because they planned to enter sham

marriages in exchange for money. He alleged Delilah's mother had already previously entered a sham marriage and he threatened he would file a criminal complaint if she and her sister did so again. He was upset because he did not want Delilah to be alone if her mother got arrested. Defendant claimed the sexual abuse allegations were in retaliation for his interference with the sham marriage scheme.

Delilah's mother testified there was no argument between her and defendant during the Pennsylvania trip. Defendant conceded Delilah's mother never entered a sham marriage after Delilah and Natalie disclosed the abuse.

The jury convicted defendant on all counts. Defendant received an aggregate term of forty-one years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On count one, the judge imposed a thirty-five-year sentence subject to NERA. This sentence was below the midpoint of the sentencing range. On count two, the judge imposed a consecutive term of six years in prison subject to NERA, which was also below the mid-point of the sentencing range. The four remaining counts for child endangerment ran concurrent to counts one and two.

Defendant raises the following points on appeal:

> POINT [I.]       THE TRIAL COURT ERRED AND
> VIOLATED       DEFENDANT'S       RIGHT       TO

9

CONFRONTATION, COMPULSORY PROCESS, AND A FAIR TRIAL IN DENYING HIS MOTION TO COMPEL THE COUNSELING AND TREATMENT RECORDS FOR COMPLAINING VICTIM, [DELILAH].

POINT [II.]    DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

I.

In January 2021, prior to trial, the defense received Delilah's psychological evaluation, which noted the Division investigation regarding the sleeping pill incident. Defendant moved to compel the release of the Division's records and Delilah's private therapy records related to the sleeping pill incident. He also sought the Division's records relating to its investigation of his abuse as disclosed by Delilah in October 2020. The defense argued this information was discoverable under Brady v. Maryland, 373 U.S. 83 (1963), because Delilah did not disclose the abuse during the Division's investigation of her sleeping pill usage. The defense asserted it could use the information as a prior inconsistent statement to impeach her credibility about why her subsequent disclosure was delayed.

The motion judge conducted a hearing and ordered the Division's records relating to its investigation of Delilah's sexual abuse be turned over for in camera review so the judge could determine whether their disclosure was necessary.

Following her in camera review of these records, the judge ordered redacted copies be turned over to the defense.

However, the judge denied defendant's request for Delilah's private therapy records. She found the prejudice by intruding upon the psychologist-patient privilege outweighed the limited probative value to the defense of using these records to show she did not report the abuse earlier, because the defense could already point out the delayed disclosure through cross-examination without resort to these sensitive records. She also denied defendant's request for the Division's records related to the sleeping pill incident, again noting the defense did not need these records to show lack of disclosure of sexual abuse.

As the judge predicted, the defense cross-examined Delilah at length during the trial regarding the fact she never disclosed the sexual abuse to anyone prior to her October 2020 disclosure. The defense also cross-examined Delilah about the fact that she never sought medical treatment or complained about pain from the penetration. In summations, defense counsel reminded the jury that each child "had numerous opportunities to report [the abuse when they were younger] and never did."

In Point I, defendant argues access to the records related to the Division investigation were necessary to "raise a reasonable doubt on the molestation

charges" because Delilah "attended therapy following the [suicide attempt]" and "[Delilah] would have told . . . [the Division's] interviewers" about the sexual assaults during these interviews. He adds, if Delilah had not disclosed the assaults during these interviews, the lack of report would also be "highly relevant to the believability of [her] claim." Defendant points out the investigation into the suicide attempt was relevant because it occurred during the time defendant was allegedly abusing her. He notes that as a matter of course, Division personnel would have to inquire whether her suicide attempt was due to abuse from her parents or family. Therefore, if she answered "no" to such questions, those answers would be valuable impeachment material and constituted discoverable material under Brady. He asserts the motion judge's decision to deny even in camera review of these records violated his constitutional rights to confrontation, compulsory process, and a fair trial.

A defendant has the constitutional right to a fair trial, to confront witnesses against them, and compulsory process. U.S. Const. amends. V, VI; N.J. Const. art. I, ¶ 10. This includes the right to "a meaningful opportunity to present a complete defense." State v. Budis, 125 N.J. 519, 531 (1991) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). "That opportunity includes seeking discovery that is relevant and material to a victim's ability to perceive,

recall, or recount an alleged sexual assault, or a proclivity to imagine or fabricate it." State v. Chambers, 252 N.J. 561, 582 (2023).

In Chambers, the Court established the "procedural and analytical framework . . . for harmonizing the constitutional rights guaranteed to criminal defendants with the rights accorded to sexual assault victims in recognition of the potential trauma, embarrassment, and anxiety that might be caused by granting access to an alleged victim's mental health records." Id. at 589. The court adopted a two-stage approach, first establishing the threshold for obtaining in camera review of confidential records and then "a more stringent standard for granting disclosure of what was found in the records to the defense." Id. at 588.

Although the threshold for obtaining in camera review is lower than the standard for ultimate disclosure to the defense, it is not nominal. On a motion for discovery of mental health records, "a defendant must make three showings: (1) that there is a substantial, particularized need for such access; (2) that the information sought is relevant and material; and (3) that the information is not available through less intrusive means." Id. at 590.

The State has a strong interest in protecting the confidentiality of mental health records so as not to create a chilling effect on reporting. See N.J.S.A. 9:6-8.10a; N.J.S.A. 45:14B-28; N.J.R.E. 505. N.J.S.A. 9:6-8.10a "is designed

as a 'procedural safeguard to protect victim children from unnecessary disclosure . . . which may cause the child further guilt, vulnerability[,] or humiliation.'" N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 636 (App. Div. 2010) (quoting N.J. Div. of Youth & Fam. Servs. v. J.C., 399 N.J. Super. 444, 447 (Ch. Div. 2006)). Division records "often contain very sensitive information, including psychologist evaluations and diagnoses. Many individuals performing the evaluations [and] treatments . . . are acting with the knowledge that their treatments or evaluations will be used for risk assessment and for therapeutic purposes only." Ibid. (alteration in original) (quoting J.C., 399 N.J. Super. at 449-50).

Pursuant to N.J.S.A. 9:6-8.10a(a), all records of child abuse shall be kept confidential and may be disclosed only under the circumstances expressly authorized by N.J.S.A. 9:6-8.10a(b)-(g). A prerequisite for disclosure requires the court to find "access to such records may be necessary for determination of an issue before it . . . ." N.J.S.A. 9:6-8.10a(b)(6). There is a "presumption of confidentiality and limitations on disclosure of [Division] records as set forth in N.J.S.A. 9:6-8.10a(a)." In re Z.W., 408 N.J. Super. 535, 540 (App. Div. 2009).

We review a motion judge's discovery rulings for an abuse of discretion standard. State v. Brown, 236 N.J. 497, 521 (2019). "[A]ppellate courts

'generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law.'" Ibid. (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)).

Pursuant to these principles, we conclude the motion judge neither abused her discretion nor misapplied the law. There is no dispute Delilah did not disclose the abuse to the Division when it was investigating the attempted suicide. If she had, defendant would have become the target of the Division's investigation. Moreover, although defendant argues the suicide attempt occurred during the period of his alleged abuse and, therefore, Delilah's failure to report the abuse would be probative to impeaching her credibility, this argument does not convince us defendant met the "substantial, particularized need" standard for these records, or that his right to confrontation was violated.

Indeed, "the Confrontation Clause only guarantees 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Pennsylvania v. Ritchie, 480 U.S. 39, 53 (1987) (emphasis omitted) (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985)). Moreover, defendant's assertion he could not have obtained the information about the Division investigation from another source is belied

by the fact he had a redacted psychological evaluation of Delilah, which referenced the investigation. The defense was able to cross-examine Delilah regarding the lack of reporting without the Division's investigation records. We are unconvinced that even if defendant had these records there was a "reasonable probability . . . the result of the proceeding would have been different." Id. at 57 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

The same is the case with defendant's claim the court should have ordered the disclosure of Delilah's private counseling records. At the outset, we note the State did not have possession of Delilah's therapeutic records. "Our criminal discovery rules do not oblige the State to produce reports of mental examinations or experiments unless they are within its 'possession, custody, or control.'" State v. Kane, 449 N.J. Super. 119, 132-33 (App. Div. 2017) (quoting R. 3:13-3(b)(1)(C)). "[E]vidence in the control of a crime victim—notwithstanding the victim's close cooperation with the prosecution—is not within the prosecutor's 'possession, custody or control.'" State v. Robertson, 438 N.J. Super. 47, 69 (App. Div. 2014) (quoting State ex rel. A.B., 219 N.J. 542, 556 (2014)). "Likewise, the State's disclosure obligations under [Brady], do not extend to documents in a private third-party's possession." Kane, 449 N.J. Super. at 133 (citing Robertson, 438 N.J. Super. at 69).

The motion judge correctly denied defendant's requests for the therapeutic records because the State did not have them. Moreover, they were privileged. See N.J.S.A. 45:14B-28, N.J.R.E. 505, N.J.S.A. 45:8B-49, and N.J.R.E. 534(a)(3).

## II.

In Point II, defendant argues that although there were two victims who alleged multiple instances of sexual abuse, the crimes arose from a single period of aberrant behavior and similar conduct, and should have warranted concurrent, rather than consecutive terms. Furthermore, at sentencing the trial judge only found aggravating factors: three, the risk of re-offense, N.J.S.A. 2C:44-1(a)(3); and nine, the need to deter defendant and others, N.J.S.A. 2C:44-1(a)(9); and mitigating factor seven, that defendant lacked a criminal history or led a law-abiding life, N.J.S.A. 2C:44-1(b)(7). Therefore, he should not have concluded the aggravating factors outweighed the mitigating factors and failed to qualitatively assess the factors as required by law.

Defendant asserts the judge should have found mitigating factors nine, defendant's character and attitude indicate he is unlikely to commit another offense, N.J.S.A. 2C:44-1(b)(9), and eleven, defendant's imprisonment would entail an excessive hardship on him and his dependents, N.J.S.A. 2C:44-

1(b)(11). He argues he supported several of his children as a breadwinner. He asserts the aggregate sentence is excessive given his age (fifty-five) and the fact that he will be deported if he lives until his release.

We review a sentencing decision for an abuse of discretion. State v. Miller, 237 N.J. 15, 28 (2019). We must "consider whether the trial court has made findings of fact that are grounded in competent, reasonably credible evidence and whether 'the factfinder [has] appl[ied] correct legal principles in exercising its discretion.'" State v. Blackmon, 202 N.J. 283, 297 (2010) (alterations in original) (quoting State v. Roth, 95 N.J. 334, 363 (1984)). We may not substitute our judgment for that of the sentencing court. State v. Fuentes, 217 N.J. 57, 70 (2014). A sentence will be affirmed unless a trial court violated the sentencing guidelines, found aggravating or mitigating factors not based on competent and credible evidence in the record, or applied the guidelines in such a manner as to "make[] the sentence clearly unreasonable so as to shock the judicial conscience." Miller, 237 N.J. at 28 (quoting Fuentes, 217 N.J. at 70).

At sentencing, a court must identify and balance the aggravating and mitigating factors pursuant to N.J.S.A. 2C:44-1(a) and (b) and explain the factual basis supporting its findings. Fuentes, 217 N.J. at 73, 81. "It is sufficient

that the trial court provides reasons for imposing its sentence that reveal the court's consideration of all applicable mitigating factors in reaching its sentencing decision." State v. Bieniek, 200 N.J. 601, 609 (2010). "After balancing the factors, the trial court may impose a term within the permissible range for the offense." Id. at 608. "[I]f the trial court fails to identify relevant aggravating and mitigating factors, or merely enumerates them, or forgoes a qualitative analysis, or provides little 'insight into the sentencing decision,' then the deferential standard will not apply." State v. Case, 220 N.J. 49, 65 (2014) (quoting State v. Kruse, 105 N.J. 354, 363 (1987)).

"[T]rial judges have discretion to decide if sentences should run concurrently or consecutively." State v. Miller, 205 N.J. 109, 128 (2011); see N.J.S.A. 2C:44-5(a). The judge may impose consecutive sentences after considering the factors outlined in State v. Yarbough, 100 N.J. 627, 643-44 (1985). Those factors focus on "the nature and number of offenses for which the defendant is being sentenced, whether the offenses occurred at different times or places, and whether they involve numerous or separate victims." State v. Carey, 168 N.J. 413, 423 (2001) (quoting State v. Baylass, 114 N.J. 169, 180 (1989)). The factors should be applied qualitatively, not quantitatively. Id. at 427. A court may impose consecutive sentences even though a majority of the

<u>Yarbough</u> factors support concurrent sentences. <u>Id.</u> at 427-28. An essential principle is that "there can be no free crimes in a system for which the punishment shall fit the crime." <u>Yarbough</u>, 100 N.J. at 643.

Pursuant to these principles, we discern no error in the trial judge's decision to impose consecutive sentences. Indeed, the judge noted there were two victims who endured separate sexual assaults over time. However, in recognition of the fact that when defendant assaulted Delilah and Natalie, he also endangered their welfare, the judge concluded the sentences on the endangerment crimes would run concurrent to the sexual assault sentences.

"When a sentencing court properly evaluates the <u>Yarbough</u> factors in light of the record, the court's decision will not normally be disturbed on appeal." <u>Miller</u>, 205 N.J. at 129. The trial judge neither deviated from <u>Yarbough</u>, nor failed to qualitatively assess its factors.

We reject defendant's argument there should have been concurrent sentences because there was "a single period of aberrant behavior." His conduct impacted two lives over the course of three years. "[T]otal impact of singular offenses against different victims will generally exceed the total impact on a single individual who is victimized multiple times." <u>State v. Molina</u>, 168 N.J. 436, 442 (2001) (quoting <u>Carey</u>, 168 N.J. at 428); <u>see also</u> <u>State v. J.G.</u>, 261 N.J.

Super. 409, 426-27 (App. Div. 1993) (finding imposition of consecutive sentences was not an abuse of discretion where sexual offenses committed by defendant took place at different times and involved multiple victims).

The trial judge did not ignore defendant's age. Rather, he noted age was a factor in choosing a sentence below the midpoint of the sentencing range on counts one and two. "[T]he middle of the sentencing range [i]s a logical starting point for . . . balancing" the sentencing factors. Fuentes, 217 N.J. at 73 (quoting State v. Natale, 184 N.J. 458, 488 (2005)). Where "the aggravating and mitigating factors are in equipoise, the midpoint will be an appropriate sentence." Ibid. But where "the aggravating factors preponderate, [a] sentence[] will tend toward the higher end of the range." Ibid.

We are unconvinced the trial judge erred because the mitigating factors outweighed the aggravating factors. The trial judge's finding that mitigating factor seven applied but had little weight, due to the fact defendant had a prior criminal history, was amply supported by the record. Moreover, the judge had no reason to find mitigating factor nine because even at the allocution, defendant failed to express responsibility or remorse for his actions. And mitigating factor eleven was inapplicable because defendant's other children were all adults, and

21

he did not demonstrate any one of them was dependent upon him as a primary caregiver.

Aggravating factor three was also supported by the record. Although the judge acknowledged defendant was evaluated and "found not to be repetitive or compulsive," he "need[ed] to have some sort of counseling to recognize that . . . this sort of behavior is completely unacceptable." Likewise, the judge correctly found aggravating factor nine and gave it great weight because defendant committed these crimes over several years. The need for general deterrence was also evident, considering the victims were children in an adult's custody and care.

The trial court neither abused its discretion nor misapplied the law at sentencing. Defendant's sentence does not shock the judicial conscience.

III.

Finally, to the extent we have not addressed an argument raised on the appeal it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22

A-1216-22