**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0972-18T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MUTAH N. BROWN,
a/k/a MUTA BROWN,

     Defendant-Appellant.

_____

Argued December 2, 2020 – Decided January 14, 2021

Before Judges Ostrer and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-07-2046.

Candace Caruthers, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Candace Caruthers, of counsel and on the briefs).

Caroline C. Galda, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Caroline C. Galda, of counsel and on the brief).

PER CURIAM

Defendant Mutah Brown and his co-defendant Kevon Anderson were indicted in Essex County under Indictment No. 17-07-2046. Defendant was charged with third-degree receiving stolen property, N.J.S.A. 2C:20-7(a) (count one);[1] first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1) (count three); first-degree aggravated manslaughter while eluding, N.J.S.A. 2C:11-4(a)(2) (count four); second-degree vehicular homicide, N.J.S.A. 2C:11-5(a) (count five); second-degree leaving the scene of an accident resulting in death, N.J.S.A. 2C:11-5.1 (count six); and second-degree eluding, N.J.S.A. 2C:29-2(b) (count seven).

On May 6, 2017 at approximately 5:30 p.m., Quadir Jackson stole a blue Mercedes SUV at gunpoint. Shortly after the carjacking, Jackson picked up defendant and Kevon Anderson. At about 6:40 p.m., Sergeant John Formisano, of the Newark Police Department, spotted the stolen Mercedes while sitting in his marked police car. Sergeant Formisano pursued the vehicle, but the driver increased his speed once he realized a police officer was behind him. Officer Victor Ortiz waited at an intersection for the Mercedes to pass, and then joined

---

[1] Anderson was only charged in count one, receiving stolen property, and in count two, third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3).

the pursuit in his marked police car. A third police car followed, as the Mercedes passed the First Precinct of the Newark Police Department. The police pursued defendant for several miles, until the Mercedes spun out of control and collided with a utility pole. Quadir Jackson was killed in the crash.

In June 2018, Judge Marysol Rosero presided over the joint trial of defendant and Anderson. Throughout the trial, defendant maintained he was not driving the Mercedes when it crashed, and that Officer Ortiz misidentified him as the driver.

In the State's opening remarks, the prosecutor identified Quadir Jackson as the "carjacker" who initiated the events which led to his death. However, the prosecutor added that if defendant

> had pulled the car over . . . hadn't ran from the police, Quadir Jackson may have come before the court, may have been tried, may have been found guilty, may have served some time in prison, but then after that, he would have had a chance to . . . turn his life around, do something good in his life, after having paid that debt to society. But defendant . . . by driving the car the way he did, basically signed Quadir Jackson's death.

Defendant lodged no objection to these opening comments.

Sergeant Formisano and Officer Ortiz testified for the State. Sergeant Formisano stated that after the Mercedes crashed, he saw "a body getting ejected from the vehicle." Officer Ortiz testified his car was the "lead pursuit vehicle"

3

when the Mercedes hit the utility pole. Additionally, Officer Ortiz testified that after the crash, he saw the driver, whom he identified as defendant, attempt to exit the Mercedes from the driver's side door, but the door would not open. Officer Ortiz stated he positioned his patrol car on the passenger side of the Mercedes and was "parallel to the carjacked vehicle" when he saw defendant and Anderson exit the car from the passenger side. The defendants fled the scene on foot. Officer Ortiz testified he never lost sight of defendant after he exited the Mercedes, and he trailed defendant as he ran from the scene until he apprehended defendant.

During his direct and cross-examination, Officer Ortiz was questioned about his training and the preparation of his police reports. The officer confirmed he needed his police reports to be "accurate," "brief" and "complete." He agreed with Anderson's defense counsel that to be complete in his reports, he "wanted to include important details." The officer also admitted on cross-examination that when he composed his post-accident report in this matter, he neglected to include his observation of defendant's unsuccessful attempt to open the Mercedes driver's side door before defendant exited from the passenger side.

Following the defense's summation, the prosecutor provided his closing remarks and stated:

A-0972-18T1

Now it's easy to say, when you go back in that jury room, that, "Well, Quadir Jackson was a carjacker. Maybe he got his just desserts." It's easy to say that. But it's not up to me, it's not up to you, and it's not up to defendant . . . to put a price on someone's life. Like I said, Quadir Jackson is [eighteen] years old. There is a lot of life left to live there. And maybe he . . . if caught at that point and been identified as the carjacker at trial, he may have served some time in prison, but then he may have got out and made something of himself. The world is full of redemption stories, people that were in prison and make their lives good. But Mutah Brown didn't give him an opportunity . . . and Quadir Jackson paid the price.

Defense counsel lodged no objection to these closing statements.

Due to defendant's position that Officer Ortiz misidentified him as the Mercedes driver when it hit the utility pole, the prosecutor also stated in closing that Officer Ortiz was "specifically looking for that Mercedes Benz. And his attention is turned to it. And he's a police officer, so he's trained to remember details. So he's looking at it and he sees the Mercedes Benz and he is able to see Mutah Brown in the driver's seat." When the prosecutor finished his closing argument, defense counsel objected at sidebar, stating "during [the prosecutor's] closing, he said that the officer . . . had special training to make [an] identification . . . . I think that was an improper statement by the State." The

judge disagreed, saying, "I heard trained to observe. I didn't hear the word special. But your objection is noted."

The jury acquitted defendant of receiving stolen property (count one) and aggravated manslaughter (count three), but found him guilty of lesser-included reckless manslaughter, as well as the remaining charges in counts four through seven.[2]

On October 5, 2018, Judge Rosero merged the lesser-included reckless manslaughter charge under count three with the aggravated-manslaughter-while-eluding charge in count four. She also merged count five, vehicular homicide, and count seven, eluding, with count four. The judge sentenced defendant to a fifteen-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on count four, and to a mandatory consecutive term of eight years on count six, leaving the scene of an accident resulting in death. Defendant's aggregate sentence totaled twenty-three years, with a twelve year and eight-month parole disqualifier.

On appeal, defendant raises the following arguments:

---

[2] Judge Rosero acquitted Anderson of receiving stolen property based on an application under State v. Reyes, 50 N.J 454 (1967); the jury convicted Anderson of resisting arrest.

POINT I

 > REPEATED INSTANCES OF PROSECUTORIAL MISCONDUCT DENIED DEFENDANT A FAIR TRIAL. (Partially Raised Below).

 > > A. In Summation, the Prosecutor Improperly Bolstered the Sole Officer to Identify Defendant as the Driver by Arguing that the Officer Received Special Training to "Remember Details."

 > > B. The State Engaged in Prosecutorial Misconduct by Repeatedly Asking the Jury to Have Sympathy for the Victim. (Not Raised Below).

POINT II

 > THE TRIAL COURT ERRED IN ITS FINAL CHARGE BY FAILING TO CHARGE THE JURY ABOUT THIRD-PARTY GUILT, THEREBY DEPRIVING DEFENDANT OF A FAIR TRIAL. (Not Raised Below).

POINT III

 > DEFENDANT'S SENTENCE OF [TWENTY-THREE] YEARS WITH [TWELVE] YEARS AND EIGHT MONTHS OF PAROLE INELIGIBILITY IS EXCESSIVE BECAUSE THE TRIAL COURT ERRED IN ITS FINDING AND WEIGHING OF AGGRAVATING AND MITIGATING FACTORS.

In Point IA., defendant renews his objection to the State's summation, contending the prosecutor's reference to Officer Ortiz's training was "not based

7

on any evidence in the record," and constituted prosecutorial misconduct. Further, he argues in Point IB. that the prosecutor's opening and closing statements amounted to misconduct to the extent his statements were "permeated with strong appeals to the jurors' sympathies for [the victim]." We are not persuaded.

"Prosecutorial misconduct may be grounds for reversal where the misconduct 'was so egregious that it deprived the defendant of a fair trial.'" State v. Kane, 449 N.J. Super. 119, 140 (App. Div. 2017) (quoting State v. Frost, 158 N.J. 76, 83 (1999)). While a prosecutor "in . . . summation may suggest legitimate inferences to be drawn from the record," a prosecutor "commits misconduct when [the summation] goes beyond the facts before the jury." State v. Harris, 156 N.J. 122, 194 (1998). "[T]he challenged comment 'must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense.'" State v. McGuire, 419 N.J. Super. 88, 150 (App. Div. 2011) (quoting State v. Timmendequas, 161 N.J. 515, 575 (1999)).

Prosecutors are "afforded considerable leeway to make forceful arguments in summation." State v. Bradshaw, 195 N.J. 493, 510 (2008) (citing Bender v. Adelson, 187 N.J. 411, 431 (2006)). Additionally, prosecutors may "argue the

merits of the State's case 'graphically and forcefully.'" State v. Smith, 212 N.J. 365, 403 (2012) (quoting State v. Feaster, 156 N.J. 1, 58 (1998)); see also State v. Morton, 155 N.J. 383, 457 (1998) (finding a prosecutor's description of the defendant as a "cold-blooded killer" was not reversible error because the evidence supported the contention and the argument was made in response to the defendant's argument).

Prosecutors may not make "inflammatory and highly emotional" appeals that have the capacity to distract the jury from a fair consideration of the evidence of guilt. State v. W.L., Sr., 292 N.J. Super. 100, 111 (App. Div. 1996) (quoting State v. Marshall, 123 N.J. 1, 161 (1991)). Further, prosecutors should not vouch for the credibility of a witness. Frost, 158 N.J. at 85. But as long as a prosecutor's "comments are based on the evidence in the case and the reasonable inferences from that evidence, the prosecutor's comments 'will afford no ground for reversal.'" Bradshaw, 195 N.J. at 510 (quoting State v. Johnson, 31 N.J. 489, 510 (1960)).

When reviewing a trial record for alleged prosecutorial misconduct, we consider a number of factors, such as:

> whether "timely and proper objections" were raised, Frost, [] 158 N.J. at 83; whether the offending remarks "were withdrawn promptly," ibid.; and whether the trial court struck the remarks and provided

9

appropriate instructions to the jury, ibid. Additionally, [we] consider whether the offending remarks were prompted by comments in the summation of defense counsel. (citations omitted). If . . . it is apparent . . . the remarks were sufficiently egregious, a new trial is appropriate, even in the face of overwhelming evidence that a defendant may, in fact, be guilty. [Id.] at 87 (noting overwhelming evidence was no justification to deprive defendant of constitutionally guaranteed right to fair trial). In contrast, if the prosecutorial remarks were not "so egregious that [they] deprived the defendant of a fair trial[,]" reversal is inappropriate. Id. at 83 (alterations in original); see State v. Ramseur, 106 N.J. 123, 322 (1987).

[Smith, 212 N.J. at 403-04.]

Because the prosecutor's closing remark about Officer Ortiz's training elicited an objection from the defense at trial, we review the comment under the harmful error standard. See State v. Lazo, 209 N.J. 9, 12 (2012). Thus, we look to "whether in all the circumstances there [is] a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits." State v. Macon, 57 N.J. 325, 338 (1971). Under this standard, a defendant must demonstrate "some degree of possibility that [the error] led to an unjust verdict. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." State v. Bankston, 63 N.J. 263, 273 (1973) (citing Macon, 57 N.J. at 335-36); see also R. 2:10-2. Here, we do not conclude the possibility of an unjust result exists.

Preliminarily, we note that when defendant's attorney objected to the prosecutor's reference to Officer Ortiz's training, she mischaracterized the remark, much as defendant does in his heading under Point IA. Specifically, defense counsel claimed the prosecutor stated Officer Ortiz "had special training to make [an] identification." However, the prosecutor instead stated that Officer Ortiz is "a police officer, so he's trained to remember details."

We are satisfied the prosecutor's mention of Officer Ortiz's training was a legitimate inference to be drawn from the evidence. Indeed, during Officer Ortiz's time on the witness stand, Anderson's defense counsel asked Officer Ortiz about his training, including training as it related to the preparation of his reports. The defense elicited the fact the officer was trained at the academy, had been on the force two years and "when . . . doing a report" he had "learn[ed] about the ABC's." Officer Ortiz's responses also affirmed he wanted his reports to be "accurate," "brief," and "complete." Therefore, a reasonable inference from the officer's testimony is that he was trained to recall the details of an incident so his reports would accurately reflect what occurred.

Next, we are satisfied the prosecutor's comment about Officer Ortiz's training was in response to the summation of defendant's counsel. During her closing remarks, she challenged Officer Ortiz's identification of the defendant

as the driver of the Mercedes at the time of the crash, initially asking jurors, "How can you be convinced that Mutah Brown was driving the car that night when the only evidence the State presented to you was the testimony of Officer Ortiz, who claimed to have seen him at the intersection of 18th Avenue." Later in her summation, she added, "Officer Ortiz claimed he saw Mutah Brown driving the car. No corroboration in dispatch. He claims he saw Mutah in the driver's seat after the crash. No corroboration in his report. We're supposed to believe Ortiz because he said so. That's just not enough." Under these circumstances, we do not perceive the prosecutor's limited closing comment about Officer Ortiz's training to constitute prosecutorial misconduct.

Finally, if we were to determine, which we do not, that the prosecutor's remark was inappropriate, we are satisfied it provides no basis for reversal. Judge Rosero extensively charged the jury regarding its function to determine whether the identification of defendants by the State's witnesses was "reliable and believable or whether it is based on a mistake or for any reason, it is not worthy of belief." The judge further instructed that "[e]yewitness identification must be scrutinized carefully" and she cited to various factors which could affect the reliability of an identification, such as lighting, distance, the witness's level of stress, and the duration of the witness's observation. Jurors are presumed to

have followed a judge's instructions, State v. Patterson, 435 N.J. Super. 498, 511 (App. Div. 2014), and defendant has not pointed to any evidence to overcome this presumption. Thus, we decline to conclude defendant was deprived of a fair trial based on the State's reference to Officer Ortiz's training.

Likewise, we are not convinced reversal is warranted on the basis of the State's opening and closing remarks about Quadir Jackson, particularly since the defense lodged no objection when these comments were made. State v. Ingram, 196 N.J. 23, 42 (2008) (defendant's failure to contemporaneously object to summation "render[s] it fair to infer from the failure to object below that in the context of the trial the error was actually of no moment") (quoting State v. Nelson, 173 N.J. 417, 471 (2002)) (internal quotation marks omitted).

Given the lack of an objection from defense counsel regarding the State's references to the victim, thereby depriving Judge Rosero of the opportunity to correct any offending remarks, we review defendant's argument under the plain error standard. R. 2:10-2; see also State v. Nero, 195 N.J. 397, 407 (2008). "Plain error is 'error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense.'" Timmendequas, 161 N.J. at 576-77 (quoting State v. Irving, 114 N.J. 427, 444 (1989)).

Here, the State not only referenced Quadir Jackson's young age at the time of his death, but also noted his criminal involvement in the carjacking that preceded his death. Additionally, the prosecutor advised that if the victim had lived, he might have faced a trial, been found guilty and served prison time for his role in the carjacking. Subsequently, Judge Rosero instructed jurors that it was their

> duty to weigh the evidence calmly and without passion, prejudice, or sympathy. Any influence caused . . . by these emotions has the potential to deprive both the State and the defendants of what you promised them, a fair trial by fair and impartial jurors.

Again, the record is devoid of any evidence the jurors ignored or were unable to follow these instructions.

Given the strength of the State's case, the fact the prosecutor described the victim as a "carjacker" while also referencing his youth, and the trial judge's explicit instructions that jurors consider the evidence "without passion, prejudice, or sympathy," we are not persuaded the State's comments about Quadir Jackson had a "clear capacity to bring about an unjust result."

In Point II, defendant argues it was incumbent upon the trial court to charge the jury on third-party guilt, although he never requested this instruction at trial. We note defendant does not contend he was deprived of the opportunity

14

to offer evidence of third-party guilt.  Instead, this issue arises because at trial, defense counsel suggested Quadir Jackson was driving the Mercedes immediately before it crashed.

Third-party guilt is an affirmative defense, where the defendant seeks to implicate "some link between the evidence and the victim or the crime."  State v. Koedatich, 112 N.J. 225, 301 (1988).  Since defendant did not request a third-party guilt charge during his trial, his argument must be considered under the plain error standard.

Our Supreme Court has held that absent a defendant's request for a jury charge, "it is only when the facts clearly indicate the appropriateness of that charge that the duty of the trial court arises."  State v. Walker, 203 N.J. 73, 86 (2010).  Further, any error in jury charges "must be considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.'"  Id. at 90 (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).  "Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'"  State v. Adams, 194 N.J. 186, 207 (2008) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

New Jersey's Criminal Model Charges state the third-party guilt defense applies when "there is evidence before [the jury] indicating that someone other than [the defendant] may have committed the crime or crimes, and that evidence raises a reasonable doubt with respect to the defendant's guilt." Model Jury Charges (Criminal), "Third Party Guilt Jury Charge" (rev. Mar. 9, 2015).

The pertinent model jury charge provides, in part:

> a defendant in a criminal case has the right to rely on any evidence produced at trial that has a rational tendency to raise a reasonable doubt with respect to his/her own guilt.
>
>     . . . .
>
> [T]he State's burden of proof . . . never shifts to the defendant. The defendant does not have to produce evidence that proves the guilt of another, but may rely on evidence that creates a reasonable doubt. In other words, there is no requirement that this evidence proves or even raises a strong probability that someone other than the defendant committed the crime. You must decide whether the State has proven the defendant's guilt beyond a reasonable doubt, not whether the other person or persons may have committed the crime(s).
>
> [Ibid.]

Here, as identification of the driver was a critical part of the State's case, the judge instructed the jury:

> The defendants, as part of their general denial, contend that the State has not presented sufficient reliable

16

evidence to establish beyond a reasonable doubt that they are the persons who committed the alleged offenses. The burden of proving the identity of the persons who committed the crime is upon the State. For you to find the defendants guilty the State must prove beyond a reasonable doubt that these defendants are the persons who committed these crimes. The defendants have neither the burden nor the duty to show that the crimes, if committed, were committed by someone else, or to prove the identity of that other person or persons. You must, therefore, . . . not only consider whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proven beyond a reasonable doubt that the defendants are the persons who committed it.

Based on the similarity between the third-party guilt charge and the charge Judge Rosero provided to jurors, and mindful the judge also clearly instructed jurors regarding how they should assess the reliability of any witness's identification of the defendants in this matter, we are satisfied the omission of the third-party guilt charge does not warrant reversal under the plain error standard.

In Point III, defendant argues his sentence is excessive and that Judge Rosero's aggravating and mitigating factors analysis was flawed. Specifically, he asserts the sentencing judge erred by: (1) considering pending charges not yet adjudicated, as well as his juvenile record; (2) failing to consider his youth

as a non-statutory mitigating factor;[3] (3) declining to find mitigating factors nine (the defendant's "character and attitude . . . indicate that he is unlikely" to re-offend), and eleven (imprisoning defendant "would entail excessive hardship" to him or his dependents), N.J.S.A. 2C:44-1(b)(9) and (11); and (4) failing to find mitigating factors four (substantial grounds tending to excuse conduct), N.J.S.A. 2C:44-1(b)(4), and five (the victim induced or facilitated defendant's conduct), N.J.S.A. 2C:44-1(b)(5). Defendant concedes his attorney did not argue in favor of these last two mitigating factors.

In support of his excessive sentence argument and pursuant to Rule 2:6-11(d), defendant also requests that we consider newly-enacted legislation, specifically L. 2020, c. 110, which amended N.J.S.A. 2C:44-1(b) to allow a sentencing judge to consider the fact a "defendant was under [twenty-six] years of age at the time of the commission of the offense." N.J.S.A. 2C:44-1(b)(14).

An appellate court reviews sentencing determinations by a trial court with a deferential standard, and must not substitute its judgment for that of the sentencing court. State v. O'Donnell, 117 N.J. 210, 215 (1989). The appellate court must affirm a sentence unless:

---

[3] As we discuss later in this opinion, approximately two years after defendant was sentenced, N.J.S.A. 2C:44-1(b)(14) was enacted, allowing sentencing courts to consider a defendant's youth as a statutory mitigating factor.

(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

"[C]ritical to the sentencing process and appellate review is the need for the sentencing court to explain clearly why an aggravating or mitigating factor presented by the parties was found or rejected and how the factors were balanced to arrive at the sentence." State v. Case, 220 N.J. 49, 66 (2014) (citing Fuentes, 217 N.J. at 73).

Here, defendant was facing a maximum aggregate sentence of thirty years. In imposing an aggregate term of twenty-three years, Judge Rosero found aggravating factors three (the risk of reoffense), N.J.S.A. 2C:44-1(a)(3); six (defendant's criminal history), N.J.S.A. 2C:44-1(a)(6); and nine (the need to deter), N.J.S.A. 2C:44-1(a)(9). Additionally, she found mitigating factor seven (the lack of a criminal record), N.J.S.A. 2C:44-1(b)(7).

In finding aggravating factor three, Judge Rosero found defendant continuously engaged in unlawful activity since 2008, which included his

19

juvenile adjudications. She cited to State v. Pindale, 249 N.J. Super. 266, 288 (App. Div. 1991) in support of her consideration of defendant's prior juvenile record.

Additionally, in addressing defendant's risk of re-offense, the judge found defendant committed his instant offenses while on pre-trial release. Further, she noted defendant never had a driver's license, had been cited previously for illegally operating a vehicle without a license, and the instant offenses included his operation of a vehicle.

In finding aggravating factor six, the judge referenced defendant's numerous juvenile adjudications and his two disorderly persons offenses. She was satisfied defendant's offenses had escalated in nature, and concluded defendant failed to show remorse for his actions, and he attempted to minimize his culpability.

Next, Judge Rosero found aggravating factor nine applied, particularly since defendant eluded police in a "very highly populated" area in Newark. She deemed his actions to be dangerous not only to the people who were with him, "but also to the community at large."

The judge determined mitigating factor seven applied, as defendant had "no prior indictable convictions," but she reiterated defendant had an extensive

A-0972-18T1

juvenile record and another matter pending. On the other hand, the judge declined to find mitigating factor nine because defendant's history and demeanor did not suggest he would not reoffend. Further, the judge denied defendant's request for mitigating factor eleven, finding there was a lack of evidence to support this factor.

Having considered Judge Rosero's comprehensive aggravating and mitigating factor analysis, we find no reason to overturn her findings, as they were well supported by competent credible evidence. We also decline to find the judge abused her discretion by failing to independently find mitigating factors four and five. To the extent Quadir Jackson was responsible for carjacking the Mercedes, the record does not reflect there were substantial grounds tending to excuse defendant's conduct or that Quadir Jackson induced defendant to drive recklessly, elude the police and leave the scene of the accident after the victim was ejected from the vehicle. Also, respecting defendant's argument the judge failed to consider his youth as a non-statutory mitigating factor, the record reflects the judge specifically mentioned defendant's age at sentencing. Thus, we are satisfied she knew his age at the time he committed his offenses and declined to find defendant's youth as a non-statutory mitigating factor. We perceive no error in this regard.

21

Finally, we weigh defendant's argument that his sentence should be adjusted based on the retroactive application of L. 2020, c. 110, which allows a sentencing judge to consider a defendant's youth as a statutory mitigating factor. Again, we disagree.

On October 19, 2020, the Legislature passed, and the Governor signed, this law into effect. The question of whether a newly enacted law applies retroactively "is a purely legal question of statutory interpretation" based on legislative intent. State v. J.V., 242 N.J. 432, 442 (2020), as revised (June 12, 2020) (quoting Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016)).[4] "To determine the Legislature's intent, we look to the statute's language and give those terms their plain and ordinary meaning." Id. at 442-43 (citations omitted). If the language of the statute clearly reflects the Legislature's intent, then the court applies the law as written, affording the terms their plain meaning. Ibid. If the language is ambiguous, "we may resort to 'extrinsic interpretative aids, including legislative history,' to determine the statute's meaning." Id. at 443

---

[4] A law is considered retroactive when it "'appl[ies] to events occurring before its enactment' or 'changes the legal consequences of acts completed before its effective date.'" Riley v. N.J. State Parole Bd., 219 N.J. 270, 285 (2014) (quoting Miller v. Florida, 482 U.S. 423, 430 (1987)). Pipeline retroactivity refers to the retroactive application of a new law to a case that is in the direct appeal process, or pipeline, when the rule becomes effective. State v. G.E.P., 243 N.J. 362, 370 (2020).

(quoting State v. S.B., 230 N.J. 62, 68 (2017)).

"When the Legislature does not clearly express its intent to give a statute prospective application, a court must determine whether to apply the statute retroactively." Ibid. (quoting Twiss v. Dep't of Treasury, 124 N.J. 461, 467 (1991)). With respect to criminal laws, courts presume that the Legislature intended them to have prospective application only. Ibid. Accord State v. Parolin, 171 N.J. 223, 233 (2002) (affording prospective application only to an amendment to NERA, which took effect immediately).

Our Court has recognized only three exceptions to the presumption of prospective application. Id. at 444. Those exceptions occur when:

> (1) the Legislature provided for retroactivity expressly, either in the language of the statute itself or its legislative history, or implicitly, by requiring retroactive effect to "make the statute workable or to give it the most sensible interpretation"; (2) "the statute is ameliorative or curative"; or (3) the parties' expectations warrant retroactive application. Gibbons [v. Gibbons], 86 N.J. [515] at 522-23 [(1981)].
>
> [Ibid.]

A curative change to a statute is limited to acts that "remedy a perceived imperfection in or misapplication of the statute." Pisack v. B & C Towing, Inc., 240 N.J. 360, 371 (2020) (quoting James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 564 (2014)). A curative change does not "alter the act in any substantial way,

but merely clarifie[s] the legislative intent behind the [previous] act." Ibid. (alterations in original) (quoting James, 216 N.J. at 564).

An ameliorative statute "refers only to criminal laws that effect a reduction in a criminal penalty." Perry v. N.J. State Parole Bd., 459 N.J. Super. 186, 196 (App. Div. 2019) (citations omitted). To be afforded retroactive application, an ameliorative statute "must be aimed at mitigating a legislatively perceived undue severity in the existing criminal law." State in Interest of J.F., 446 N.J. Super. 39, 55 (App. Div. 2016) (quoting Kendall v. Snedeker, 219 N.J. Super. 283, 286 n.1 (App. Div. 1987)).

Consistent with the presumption in favor of prospective application, our savings statute also "establishes a general prohibition against retroactive application of penal laws." State v. Chambers, 377 N.J. Super. 365, 367 (App. Div. 2005). The savings statute provides:

> No offense committed, and no liability, penalty or forfeiture, either civil or criminal, incurred, previous to the time of the repeal or alteration of any act or part of any act, by the enactment of the Revised Statutes or by any act heretofore or hereafter enacted, shall be discharged, released or affected by the repeal or alteration of the statute under which such offense, liability, penalty or forfeiture was incurred, unless it is expressly declared in the act by which such repeal or alteration is effectuated, that an offense, liability, penalty or forfeiture already committed or incurred shall be thereby discharged, released or affected; and

> indictments, prosecutions and actions for such offenses, liabilities, penalties or forfeitures already committed or incurred shall be commenced or continued and be proceeded with in all respects as if the act or part of an act had not been repealed or altered, except that when the Revised Statutes, or other act by which such repeal or alteration is effectuated, shall relate to mere matters of practice or mode of procedure, the proceedings had thereafter on the indictment or in the prosecution for such offenses, liabilities, penalties or forfeitures shall be in such respects, as far as is practicable, in accordance with the provisions of the Revised Statutes or such subsequent act.
>
> [N.J.S.A. 1:1-15 (emphasis added).]

Thus, pursuant to the savings statute, a new law will not affect a penalty already incurred, absent a clearly conveyed intention from the Legislature that the new law be afforded retroactive application. Chambers, 377 N.J. Super. at 374-75.

Neither the savings statute nor any published decision interpreting it defines when a penalty is incurred for purposes of N.J.S.A. 1:1-15. In Chambers, the court recognized that a penalty could be incurred on the date of conviction or the date of sentencing, but the court did not resolve the issue because it made no difference to the outcome; the new law in that case had been enacted after both the conviction and sentencing, and there was no indication from the Legislature that it should be afforded retroactive application. 377 N.J. Super. at 372-73.

Here, the Legislature did not specifically state whether <u>L.</u> 2020, <u>c.</u> 110, should be afforded retroactive application; however, it provided that the amendment would "take effective immediately." <u>L.</u> 2020, <u>c.</u> 110. In two recent decisions, our Supreme Court reaffirmed a principle it had set forth in prior cases that a statute's immediate or future effective date evidences the Legislature's intent to afford a newly enacted statute prospective application only. <u>J.V.</u>, 242 N.J. at 435 (effective date in the future); <u>Pisack</u>, 240 N.J. at 370 (immediate effective date). We are satisfied that principle holds here, because "had the Legislature intended an earlier date for the law to take effect, that intention could have been made plain in the very section directing when the law would become effective." <u>J.V.</u>, 242 N.J. at 445 (quoting <u>James</u>, 216 N.J. at 568). Thus, because defendant was sentenced well before the effective date of <u>L.</u> 2020, <u>c.</u> 110, he is not entitled to its benefit.

In sum, we discern no abuse of discretion in the trial court's identification and weighing of the applicable aggravating and mitigating factors. Moreover, as the judge adhered to the sentencing guidelines and defendant's sentence does not shock the judicial conscience, we perceive no basis to disturb defendant's sentence.

To the extent we have not addressed defendant's remaining arguments, we are satisfied they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27

A-0972-18T1