# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2846-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TERRANCE V. NOKES, a/k/a
TERRANCE VAN NOKES,
KASUAN TART, KASUAN B.
TART, TERRACE V. NOKES,
TERANCE NOKES, TROY Q.
NOKES, TYRON NOKES,
TYRON Q. NOKES, and TERRY
NOKES,

     Defendant-Appellant.

_____

     Argued October 25, 2023 – Decided May 10, 2024

     Before Judges Vernoia and Gummer.

     On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 19-02-0125.

     Samuel Clark Carrigan, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E.

Krakora, Public Defender, attorney; Samuel Clark Carrigan, of counsel and on the briefs).

Michael C. Mellon, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Christine A. Hoffman, Acting Gloucester County Prosecutor, attorney; Michael C. Mellon, on the brief).

PER CURIAM

Defendant Terrance V. Nokes appeals from his convictions for possession of a controlled dangerous substance (CDS), possession of CDS with the intent to distribute, criminal restraint, and endangering the welfare of a child and from the resulting aggregate twenty-four-year prison sentence. He argues the trial court erred in permitting the State's witnesses to give improper opinion testimony related to the CDS charges, in giving the jury incorrect instructions on the criminal-restraint and endangering charges, and in imposing sentence. We affirm the convictions but vacate the sentence and remand for a resentencing.

I.

At approximately 2:00 a.m. on December 16, 2018, defendant arrived at the two-story townhome he shared with his fiancée, N.S.-G. (Nancy), and her

nine-year-old son, D.S.G. (Declan).[1] Defendant's "yelling" and knocking on the door initially woke Declan up, but he went back to sleep. While they were in the front part of the house and Declan was in the back part, defendant and Nancy began to argue. According to Declan, when he woke up, he saw defendant and Nancy "fist fight[ing]." Declan told defendant to leave, but he didn't.

Nancy hit defendant because she wanted him to leave. Defendant became more enraged. Nancy ran upstairs. She called 9-1-1. Defendant came after her, grabbed her by the neck, and held her. She tried to "elbow" him, but he was "big" and she was "weak" and felt there was "nothing [she] could do." She told him to get out; he told her she could not leave until the police arrived. He was "using his arm to restrain [her] from moving," placing his arm around her neck. Nancy couldn't move, was "losing air," and was "starting to . . . fade." Declan witnessed defendant "choking" his mother. He started "tussling" with defendant and "pushed his arm back to give [Nancy] some air" because she "was starting to . . . cough and stuff." Nancy was able to "get up to go." She ran down the steps. Defendant ran after her and fell.

---

[1] Due to the nature and underlying facts of defendant's convictions, we use initials and fictitious names when referencing the victims. See R. 1:38-3(c)(12).

Patrolmen Shawn Gambale and Bill Rosati entered the house through the front door, which Nancy had opened earlier. Officer Collin Crawford arrived later. Rosati saw defendant "lunging towards the victim." Gambale believed defendant was attempting to "dive on top of" Nancy. He kicked defendant, tackled him to the ground, struck him with his knee, advised him he was under arrest, and handcuffed him with Rosati while Crawford escorted Nancy and Declan to another part of the house. Crawford noticed Nancy had a bleeding "fat lip," a torn shirt, and "red marks" on her neck.

Gambale searched defendant's pants pockets and "found a plastic bag which was full of what appeared to be crack-cocaine and regular cocaine." He also found empty bags in the same pocket. Defendant denied owning the drugs and told Nancy to flush them. Gambale called for an ambulance. Nancy refused medical attention. Rosati accompanied defendant to the hospital.

In 2019, a grand jury returned an indictment charging defendant with third-degree aggravated assault, strangulation of a domestic-violence victim, N.J.S.A. 2C:12-1(b)(13); third-degree criminal restraint, N.J.S.A. 2C:13-2(a); third-degree terroristic threats, N.J.S.A. 2C:12-3(b); two counts of third-degree possession of CDS, N.J.S.A. 2C:35-10(a); second-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(b)(2); third-degree resisting arrest by

force, N.J.S.A. 2C:29-2(a)(3)(a); third-degree endangering the welfare of a child by knowingly causing harm that would make the child an abused or neglected child, N.J.S.A. 2C:24-4(a)(2); and second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1). Another grand jury returned a second indictment charging defendant with third-degree witness tampering, N.J.S.A. 2C:28-5(a).

Defendant was tried before a jury in 2020. The State called as witnesses Nancy, Declan, the officers who responded to the 9-1-1 call, two expert witnesses, a witness concerning the 9-1-1 call, and a witness concerning calls between defendant and Nancy while he was in jail. A recording of Nancy's 9-1-1 call was played for the jury. In addition to hearing her report that her "boyfriend" had come "in drunk and we just started fighting" and that he was following her and she could not separate herself from him, the jury heard Nancy say, "Stop yelling at him" and "I can't move" and tell someone repeatedly to "get off of [her]." A child's voice could be heard, repeatedly saying, "stop."

Gambale testified he had attended "quite a number of schools," including "drug-related schools." According to Gambale, he was "familiar with various types of illegal drugs." Gambale was shown and testified about the plastic bag he had found in defendant's pocket.

> [Assistant Prosecutor (AP):] Did you find anything of
> evidential value pursuant to your search?

5

[Gambale:] I found a plastic bag which was full of what appeared to be crack-cocaine and regular cocaine.

. . . .

[AP:] What is S-15 [the bag found in defendant's pocket]?

[Gambale:] It appears to be cocaine and -- well, without opening the other one, I -- I imagine it's the crack-cocaine. But I can't see through the other bag.

. . . .

[AP:] So, Officer, I saw that you opened S-15, which is a bag. And out of S-15 came two smaller bags. What are those two smaller bags?

[Gambale:] Okay. This bag marked with the case number and Number 1 at the end of it is orange -- small orange plastic bags. And what's contained inside of each one is suspected crack-cocaine. Usually, an off colored drug. Pure cocaine is often what they call stepped-on or mixed with other things to make it crack-cocaine.

[AP:] And, Officer, what is the other smaller bag that came out of S-15?

[Gambale:] These are bags of what appears to be pure cocaine or possibly pure cocaine, close to pure. It's a whiter substance and it's not a rock like. It's more of a powder substance.

[AP:] How do you recognize what's in S-15?

A-2846-21

> [Gambale:] Okay. So I've been a police officer for twelve years. I've gone to multiple drug schools and been a part of hundreds of drug arrests.

Defense counsel did not object to those questions or to the admission of S-15 and its contents into evidence.

Gambale also testified about the empty bags he had found in defendant's pants pocket, describing them as "empty bags of what are usually used to carry crack-cocaine." When asked how he was able to recognize those items, Gambale explained, "From my experience, once again, of being part of hundreds of drug arrests, several drug schools. I'm just able to easily identify that, along with it was seized at the same time as I seized the other drugs." Defense counsel again did not object to those questions or to the admission of the bags into evidence.

Mandelle Hunter, a forensic scientist employed by the New Jersey State Police in the drug unit, was qualified without objection as an expert in the field of testing and analysis of CDS. When asked what evidence she had handled with respect to this case, Hunter responded, "It looks like it was two items. One item contained twenty-three bags of purported cocaine and one bag containing a total of five bags of purported cocaine." Hunter testified she had tested the contents of three of the twenty-three bags contained in the first item she described and the contents of all the bags in the second item. Each of the tested

7

bags contained cocaine, weighing a total of 14.38 grams. She did not test the contents of the remaining bags of the first item, which contained eight grams of powder having the same appearance as the powder contained in the tested bags, because the additional eight grams was not legally significant.

The State also called as an expert witness Harry Castaner, who was employed by the county prosecutor's office as a detective and had been assigned for several years to "the gangs, guns and narcotics task force." He previously had worked for the Drug Enforcement Administration, the Federal Bureau of Investigation, and the Federal Bureau of Alcohol, Tobacco, and Firearms. He spent fourteen years of his twenty-three-year law-enforcement career employed in the narcotics field. He worked part of that time as an undercover agent selling and buying drugs. He had been involved in over 500 narcotics-related investigations. He had had training in the amount of CDS a person might have for personal use and for distribution to other people. With no objection, he was admitted as an expert in the field of narcotics paraphernalia and narcotics distribution.

Castaner testified about how cocaine is packaged for street-level distribution and about the significance of baggies in the use and distribution of illegal drugs. He explained drug dealers typically possess empty and unused

8

baggies whereas drug users would possess torn and broken bags containing drug residue. The court sustained an objection to a question posed by the assistant prosecutor about the potential sales and profits a dealer would receive if he sold the amount of cocaine found in defendant's possession. In a colloquy outside the presence of the jury, the assistant prosecutor queried if he could ask Castaner a dealer's potential sales and profits obtained by selling cocaine by the gram. Defense counsel objected to "get[ting] into specifics that in any way related to this case." He conceded, however, Castaner could "testify as to the methods of packaging, the methods of sales, prices, which he's done." The court explained:

> Certainly, the expert cannot opine as to the ultimate issues that should be before the jury to determine whether the State has met its burden. It's up to them to decide those issues. However, he certainly can lend certain information to the jury that they may not be aware of, such as the cost of the packaging or the cost of the drug itself per package, methods of packaging, types of packaging, types of sales, things that he has observed. But he cannot state that the -- your hypothetical just cannot make him give an opinion as to anything that would be one of the elements of the offense, which would be the ultimate determination to determine whether the evidence is bore out.
>
> . . . .
>
> And as I said, the packaging and the amount normally for personal use, [he] certainly can testify as to those issues . . . .

The assistant prosecutor asked Castaner without objection the per gram cost of cocaine in December 2018. He also asked, without objection, whether "in [his] experience the presence of cocaine without anything to ingest it with" told him anything. Castaner responded, "[t]he presence of cocaine by itself and strictly no implements tells me that the person is dealing drugs as opposed to ingesting drugs." The assistant prosecutor also asked Castaner without objection whether the presence or absence of a digital scale or baggies would impact his opinion.

On cross-examination, Castaner testified he had seen drug users tear a bag open and "snort it right up" without using an implement. He also testified that people who use drugs sometimes support their habit by selling drugs and possess drugs they intend to sell and drugs they intend to use. He described the differences between cocaine and crack cocaine.

> [Defense counsel:] And what is the difference between powdered cocaine and crack cocaine?
>
> [Castaner:] One is cooked up and one is not. And the means of ingestion is also different as well.
>
> [Defense counsel:] Do they look the same or do they look different?
>
> [Castaner:] They look different. One is broken down into a powdered form and one is a hard, rocklike substance.

[Defense counsel:] So the crack cocaine would be the hard, rocklike substance?

[Castaner:] Yes.

[Defense counsel:] Okay. And how about the powder?

[Castaner:] The powder would be a fine powder, best definition for a lay person is sugar in order for you to understand it.

[Defense counsel:] Meaning it looks somewhat like sugar?

[Castaner:] It -- no, it looks like a fine powder.

Defendant did not call any witnesses in his defense. He moved to dismiss certain charges. The court granted that motion in part, dismissing the third-degree terroristic-threats charge and one of the third-degree possession of CDS charges.

During the on-the-record charge conference, defense counsel did not object to any proposed instructions regarding the criminal-restraint or child-endangerment charges. On the criminal-restraint charge, the court instructed the jury "a person is guilty of criminal restraint if he restrains another unlawfully in circumstances exposing the other to risk of serious bodily injury" and that "the State must prove beyond a reasonable doubt[: (1)] that defendant knowingly restrained [Nancy]; [(2)] that defendant knew the restraint was unlawful; and

11

[(3)] that the restraint was under circumstances in which the defendant knowingly exposed [Nancy] to the risk of serious bodily injury." As to the second element, the court defined the term "unlawful" as meaning "to accomplish the restraint by force, threat, or deception." Regarding the element of knowledge, the court instructed the jury:

> With regard to all three of these elements, the State must prove beyond a reasonable doubt the defendant acted knowingly. A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. Knowing, with knowledge or equivalent terms have the same meaning.
>
> And as I've already told you knowledge is a condition of the mind which cannot be seen and can only be determined by inferences from conduct, words or acts. A state of mind is rarely susceptible to direct proof but must ordinarily be inferred from the facts. Therefore, it is not necessary that the State produce witnesses to testify that an accused said he had a certain state of mind when he engaged in a particular act. It is within your power to find that such proof has been furnished beyond a reasonable doubt by inference which may arise from the nature of his of acts and his conduct, and from all that he said and did at the particular time and place, and from all of the surrounding circumstances reflected in the testimony, and the evidence adduced at trial.

A-2846-21

On the child-endangerment charge, the court instructed the jury a person is guilty of endangering the welfare of a child if he or she "causes the child harm that would make the child an abused and neglected child." The court also instructed the jury:

> the State must prove beyond a reasonable doubt: number one, that [Declan] was a child. Number two, the defendant knowingly caused [Declan] harm that would make the child abused or neglected. And number three, the defendant knew that such conduct would cause the child harm that would make [him] an abused and neglected child.

The court explained the second element could:

> include performing any indecent, immoral or unlawful act or deed in the presence of the child that may tend to debauch or endanger or degrade the morals of the child.
>
> . . . .
>
> Cruelty to a child shall consist of any of the following acts, including inflicting upon the child unnecessary suffering or pain either mental or physical, any willful act or admission or commission whereby unnecessary pain or suffering, whether mental or physical is caused or permitted to be inflicted on a child, or exposing the child to unnecessary hardship, fatigue, mental or physical strain that may tend to injure the health or physical or moral well-being of such child.

Near the beginning of the charge, the court instructed the jury about its role:

13

Now, let's talk about the function of the jury. As I instructed you when we started this case, I explained to you that you are the judges of the facts and, as judges of the facts, you are to determine the credibility of the various witnesses, as well as the weight to be attached to their testimony. You and you alone are the sole and exclusive judges of the evidence, of the credibility of the witnesses and the weight to be attached to the testimony of each witness.

The court also instructed the jury about the expert witnesses:

Let's talk about expert testimony. As a general rule witnesses can testify only as to facts known by them. This rule ordinarily does not permit the opinion of a witness to be received as evidence. However, an exception to this rule exists in the case of an expert witness who may give his or her opinion as to any matter in which he or she is versed which is material to the case. In legal terminology, an expert witness is a witness who has some special knowledge, skill, experience or training that is not possessed by the ordinary juror that may be able to provide assistance to the jury in understanding the evidence presented and determining the facts in this case.

In this case, Mandelle Hunter was called as an expert in testing and analysis of controlled dangerous substances. And Detective Harry Castner was called as an expert in drug paraphernalia, and distribution of controlled dangerous substances.

You are not bound by such expert's opinion, but you should consider each opinion and give it the weight to which you deem it is entitled, whether that be great or slight, or you may reject it. In examining each opinion, you may consider the reasons given for it, if any, and

14

you may also consider the qualifications and credibility of the expert.

It is always within the special function of the jury to determine whether the facts on which the answer or testimony of an expert is based actually exist. The value or weight of the opinion of the expert is dependent upon, and is no stronger than, the facts on which it is based. In other words, the probative value of the opinion will depend upon whether from all of the evidence in the case, you find that those facts are true. You may, in fact, determine from the evidence in the case that the facts that form the basis of the opinion are true, are not true, or are true in part only, and, in light of such findings, you should decide what affect such determination has upon the weight to be given to the opinion of the expert. Your acceptance or rejection of the expert opinion will depend, therefore, to some extent on your findings as to the truth of the facts relied upon.

The ultimate determination of whether or not the State has proven defendant's guilt beyond a reasonable doubt is to be made only by the jury.

The jury acquitted defendant of the resisting-arrest, witness-tampering, and assault charges. It convicted him of criminal restraint, possession of CDS, possession of between half an ounce and five ounces of CDS with the intent to distribute, and endangering the welfare of a child.

At the sentencing hearing, the court found aggravating factors three (risk defendant will commit another offense), six (extent and seriousness of defendant's criminal history), nine (need to deter defendants and others), eleven

A-2846-21

(a fine without imposition of a prison sentence may be seen as a cost of doing business), and fourteen (the offense involved an act of domestic violence committed in the presence of a child). N.J.S.A. 2C:44-1(a)(3), (6), (9), (11), and (14). The court found no mitigating factors. The court granted the State's motion to sentence defendant to an extended term pursuant to N.J.S.A. 2C:43-6. The court found consecutive sentences were appropriate because the convictions were separate from each other and "to protect society from those who are unwilling to live a productive life and who resort to criminal activity in the furtherance of their anti-social lifestyle."

On the possession of CDS with the intent to distribute, the court sentenced defendant to a sixteen-year term of imprisonment. It merged the possession of CDS conviction with the conviction for possession of CDS with the intent to distribute. The court sentenced defendant to four-year terms of imprisonment on the criminal-restraint and endangering convictions, with each sentence to run consecutive to the sentence for the conviction for possession of CDS with the intent to distribute. Thus, defendant received an aggregate prison term of twenty-four years.

Defendant raises the following issues on appeal:

POINT I

IMPROPER EXPERT OPINION TESTIMONY ON THE ULTIMATE ISSUE AND EXPERT OPINION TESTIMONY FROM AN UNQUALIFIED WITNESS PREJUDICED DEFENDANT'S RIGHT TO A FAIR TRIAL. (Not raised below)

A. The Drug Expert Improperly Opined On The Ultimate Issue: That The Drugs Were For Distribution, Not Personal Use.

B. The Lay Officer Improperly Offered Expert Opinions Without Being Appropriately Qualified And Testified On The Ultimate Issue.

POINT II

THE COURT ERRED IN FAILING TO TELL THE JURY THAT AN HONEST BELIEF IN THE LAWFULNESS OF THE USE OF FORCE PRECLUDED A GUILTY VERDICT FOR CRIMINAL RESTRAINT. (Not raised below)

POINT III

THE FAILURE TO INSTRUCT THE JURY ON THE SPECIFIC BASES FOR THE CHILD ENDANGERMENT CHARGE AND THAT THEY HAD TO UNANIMOUSLY AGREE ON THE OPERATIVE CONDUCT REQUIRES REVERSAL OF DEFENDANT'S CONVICTION. (Not raised below)

17

POINT IV

> THE 24-YEAR AGGREGATE SENTENCE IS
> EXCESSIVE AND SHOULD BE VACATED
> AND REMANDED BECAUSE OF THE
> IMPROPER ANALYSIS OF AGGRAVATING
> FACTORS, THE CONSIDERATION OF
> ACQUITTED CONDUCT, AND AN
> INCOMPLETE [STATE V.] YARBOUGH[, 100
> N.J. 627 (1985),] ANALYSIS.

II.

Because defendant did not object or otherwise raise before the trial court the evidential or jury-charge issues he now raises on appeal, we review his arguments on those issues under the plain-error standard of Rule 2:10-2. See State v. Macchia, 253 N.J. 232, 250 (2023) (finding we review jury instructions challenged for the first time on appeal "for plain error"); State v. Singh, 245 N.J. 1, 13 (2021) (finding "[w]hen a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard"). "Under that standard, an unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result.'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting R. 2:10-2). "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Melvin, 65 N.J. 1, 18-19 (1974)). "The error must be evaluated 'in light of the overall strength of the State's case'"

18

to determine whether it rises to the level of plain error. State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)).

### A.

We "defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). We "will not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)). That standard applies equally to rulings about expert testimony. See State v. Cotto, 471 N.J. Super. 489, 531 (App. Div. 2022) ("Even if objected to, '[t]he admission or exclusion of expert testimony is committed to the sound discretion of the trial court.'" (quoting Townsend v. Pierre, 221 N.J. 36, 52 (2015))). When an appealing party fails to object to an evidentiary ruling at trial, we review it under the plain-error standard. Singh, 245 N.J. at 13. "[T]he failure to object to testimony permits an inference that any error in admitting the testimony was not prejudicial." Cotto, 471 N.J. Super. at 537. We review an evidentiary decision de novo if the trial court applied the wrong legal standard in admitting or excluding the evidence. State v. Trinidad, 241 N.J. 425, 448 (2020). Not "[e]very mistaken evidentiary ruling" requires "the reversal of

a conviction. Only those that have the clear capacity to cause an unjust result" will lead us to reverse. Garcia, 245 N.J. at 430.

1.

Defendant complains about one of Castaner's answers. Defendant contends Castaner gave an improper "ultimate-issue opinion" when, after he was asked without objection whether "in [his] experience the presence of cocaine without anything to ingest it with" told him anything, he responded: "The presence of cocaine by itself . . . [with] no implements tells me that the person is dealing drugs as opposed to ingesting drugs."

In State v. Cain, 224 N.J. 410, 413 (2016), the Court recognized the important role expert testimony can play in a drug-distribution case: "Expert testimony in many drug-distribution cases provides necessary insight into matters that are not commonly understood by the average juror, such as the significance of drug packaging and weight, scales and cutting agents, stash sites, the role of confederates, and other activities consistent with drug trafficking." The Court explained:

> The average juror is not knowledgeable about the arcana of drug-distribution schemes. Law enforcement officers with extensive training, education, and experience of the drug world have "specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue."

N.J.R.E. 702. Experts can help jurors understand the indicia of a distribution operation, such as how drug traffickers package and process drugs for distribution. See [State v.] Odom, 116 N.J. [65,] 73-75 [(1989)]. Experts can shed light on the significance of the quantities and concentrations of drugs, the value of drugs, the use of identifiable logos on drug packaging, and the function of drug paraphernalia, e.g., scales, baggies, and cutting agents.

[Id. at 426.]

The Court, however, cautioned:

Equally clear is that an expert should not express an opinion on matters that fall within the ken of the average juror or offer an opinion about the defendant's guilt. [State v. Nesbitt, 185 N.J. 504,] 512-14 [(2006)]. . . . The jury brings a breadth of collective experience, knowledge, and wisdom to the task. Expert testimony is not necessary to explain to jurors the obvious. It is not a substitute for jurors performing their traditional function of sorting through all of the evidence and using their common sense to make simple logical deductions.

[Id. at 426-27.]

The Court concluded, "[g]oing forward, in drug cases, an expert witness may not opine on the defendant's state of mind. Whether a defendant possessed a controlled dangerous substance with the intent to distribute is an ultimate issue of fact to be decided by the jury." Id. at 429. The Court also stated its belief that "hypothetical questions should be used only when necessary in drug cases." Ibid. The Court, however, expressly held "[q]uestions can incorporate the

21

evidence of record, such as the quantity of drugs, packaging materials, scales, and money discovered, and the expert can render an opinion on their significance in a drug-distribution operation." Ibid.

We conclude the court did not err in the admission of that one answer by Castaner. It was not testimony given in response to a "lengthy hypothetical question" that "included [an] assumed fact that . . . . was not based on an actual fact," State v. Simms, 224 N.J. 393, 396 (2016), or a "classic mid-trial summation," Cain, 224 N.J. at 431. It also was not an answer to "a question within the understanding of the average juror." State v. Covil, 240 N.J. 448, 466 (2020). Rather, it was a response to a question about a subject matter well within his narcotics-paraphernalia field of expertise and permissibly "shed light on the significance of . . . drug paraphernalia." Cain, 224 N.J. at 426. Castaner also did not expressly opine defendant possessed cocaine with the intent to distribute it and did not attribute to defendant "any state of mind that was an element of the charged offenses." State v. Hyman, 451 N.J. Super. 429, 452 (App. Div. 2017).

Even if the admission of his answer was an error, it did not rise to the level of plain error, considering as we must the testimony and evidence as a whole and not in isolation. In addition to the answer to the question about which

22

defendant complains, Castaner testified he had seen users ingest drugs without using an implement and that drug users sometimes support their habit by selling drugs and, consequently, possess drugs they intend to use and drugs they intend to sell. Defendant's CDS convictions were otherwise supported by testimony and evidence regarding the packaging and amount of cocaine recovered. And the court gave the jury appropriate instructions regarding the jury's role as the ultimate factfinder and the ability of the jury to accept or reject any expert opinion. See State v. Derry, 250 N.J. 611, 634 (2022) (referencing importance of jury instructions that "convey[] to the jury its absolute prerogative to reject both the expert's opinion and the version of the facts consistent with that opinion" (quoting State v. Torres, 183 N.J. 554, 580 (2005))). Under all those circumstances, Castaner's testimony was not "clearly capable of producing an unjust result," R. 2:10-2, and, thus, its admission was not plain error.

2.

Defendant complains Gambale, who was not called by the State as an expert witness, nevertheless improperly offered expert opinions on the ultimate issue when he described the empty bags he had found on defendant as "empty bags of what are usually used to carry crack-cocaine" and described the contents of the bags he had found on defendant as being "suspected crack-cocaine.

Usually, an off colored drug. Pure cocaine is often what they call stepped-on or mixed with other things to make it crack cocaine" or "pure cocaine or possibly pure cocaine, close to pure. It's a whiter substance and it's not a rock like. It's more of a powder substance."

A police officer may "offer lay opinions in certain circumstances when 'the lay opinion testimony was based on, and supported by testimony about, the officer's personal perception and observation.'" Derry, 250 N.J. at 632 (quoting State v. McLean, 205 N.J. 438, 459 (2011)). However, "a question that requires a witness to use 'his training and experience' to 'testify about his belief as to what had happened,' strongly suggests that the question calls for an expert opinion . . . ." Ibid. (quoting McLean, 205 N.J. at 462).

Gambale's testimony clearly "exceeded the bounds of proper lay opinion testimony and crossed over into the realm of expert testimony." State v. Kittrell, 279 N.J. Super. 225, 236 (App. Div. 1995). His testimony was not limited to his sensory perceptions of the bags and substance found on defendant; he opined about the use of the bags and make-up of the substance admittedly based on his law-enforcement experience and training. The court erred in admitting that testimony when the State had not qualified him as an expert witness.

That error, however, was not plain error "clearly capable of producing an unjust result," given the other evidence in the record. R. 2:10-2; see also Trinidad, 241 N.J. at 446-47 (finding the admission of police officer's opinion testimony did not constitute plain error given other evidence of defendant's guilt). Gambale's purported expert testimony was consistent with – and did not, as defendant argues, clash with – Castaner's properly admitted and unchallenged testimony about drug packaging and distribution. His testimony about the contents of the bags was sufficiently supported by Hunter's testimony.

B.

We now address the jury instructions regarding the criminal-restraint and endangering charges, mindful of the following guiding principles.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)). In charging a jury, a "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). "[B]ecause correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to

constitute reversible error."  State v. Jenkins, 178 N.J. 347, 361 (2004).

"The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law."  Baum, 224 N.J. at 159 (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

"[A] jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough.'"  Cotto, 471 N.J. Super. at 543 (quoting State v. R.B., 183 N.J. 308, 325 (2005)).  "Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case."  State v. Concepcion, 111 N.J. 373, 379 (1988).  "However, there is no principle requiring that in every case a court must deliver a specifically tailored instruction relating the facts of the case to the applicable law."  State v. T.C., 347 N.J. Super. 219, 240 (App. Div. 2002).  "When the facts are neither complex nor confusing, a court does not have to provide an intricate discussion of the facts in the jury charge."  Cotto, 471 N.J. Super. at 544; see also State v. White, 326 N.J. Super. 304, 315 (App. Div. 1999) (finding that even though a more precise molding of the jury instructions to the facts would have been

preferable, the charge given was sufficient because "as a whole, [it] was consistent with the factual theories advanced by the parties").

To find plain error in a jury instruction, "there must be 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" Cotto, 471 N.J. Super. at 544 (quoting State v. Montalvo, 229 N.J. 300, 321 (2017)). By not objecting to a charge, a defendant creates "a presumption that the charge was not error and was unlikely to prejudice . . . [the] defendant's case." Id. at 320. "[A]n 'alleged error is viewed in the totality of the entire charge, not in isolation,' and 'any finding of plain error depends on an evaluation of the overall strength of the State's case.'" Cotto, 471 N.J. Super. at 545 (quoting State v. Nero, 195 N.J. 397, 407 (2008)).

1.

A person commits third-degree criminal restraint if he or she "knowingly . . . [r]estrains another unlawfully in circumstances exposing the other to risk of serious bodily injury." N.J.S.A. 2C:13-2. "[T]he 'knowing' mental state applies to each of [those] elements . . . ; that is, he knowingly restrains, he knows the restraint is unlawful, and knows that the restraint is under circumstances

exposing the victim to serious bodily injury." State v. Worthy, 329 N.J. Super. 109, 113 (2000). To be unlawful, the restraint must be accomplished by "force, threat, or deception." N.J.S.A. 2C:13-1(d).

Defendant does not assert the court failed to follow the model jury charge in instructing the jury on criminal restraint or failed to apply the knowing mental state to each element of the crime. Cf. Worthy, 329 N.J. Super. at 117-18 (reversing criminal-restraint conviction because trial court failed to apply the knowing mental state to all three elements in its jury charge). Instead, defendant contends the court's instruction was "inadequate because it failed to inform the jury that if [defendant] honestly believed he was permitted to prevent [Nancy] from leaving before police arrived, then he could not be guilty of criminal restraint." We see no legal or factual basis in this case to modify the instructions as defendant now argues. See State v. Dunbrack, 245 N.J. 531, 545 (2021) (holding when a defendant did not request a charge at trial, an appellate court "assesses whether the record 'clearly indicated' the charge, such that the trial court was obligated to give it sua sponte," meaning "'if the evidence is jumping off the page'" (quoting State v. Denofa, 187 N.J. 24, 42 (2006))).

The assumptions underlying defendant's argument are without support in the record. Defendant had no factual or legal basis to "honestly" believe he had

a right to restrain Nancy. The record lacks any evidence she was attempting to leave in an effort to avoid the police. To the contrary, the evidence demonstrates Nancy had sought the assistance of the police by calling 9-1-1. The evidence shows she was not running away from the house to avoid the police she had called to the house but was running upstairs in an apparent effort to get away from defendant. When he followed her and grabbed her, she was fleeing defendant, not the police. Given the record evidence, it would have been error for the court to give the charge defendant now requests on appeal.

2.

Defendant does not contend the court failed to give the model jury charge on child endangerment. Instead, defendant argues the "jury instruction should have precisely identified the alleged conduct that could have impaired or debauched the morals of the child," suggesting defendant's "com[ing] home late at night while intoxicated," "drug use," or "use of coarse language" could have been the basis of the child-endangerment conviction. He also contends the court should have given the jury a specific unanimity instruction on the child-endangerment charge to eliminate the possibility of a fragmented verdict. We disagree.

29

"[O]rdinarily, a general instruction on the requirement of unanimity suffices to instruct the jury that it must be unanimous on whatever specifications it finds to be the predicate of a guilty verdict." Macchia, 253 N.J. at 256-57 (quoting State v. Parker, 124 N.J. 628, 641 (1991)). "The fundamental issue is whether a more specific instruction was required . . . to avert the possibility of a fragmented verdict." State v. Frisby, 174 N.J. 583, 598 (2002). A fragmented verdict typically results when "it appears that a genuine possibility of jury confusion exists or that a conviction may occur as a result of different jurors concluding that a defendant committed conceptually distinct acts." Parker, 124 N.J. at 641. In determining whether a unanimity charge was required, "[t]he reviewing court should examine two factors: whether the acts alleged are conceptually similar or are 'contradictory or only marginally related to each other,' and whether there is a 'tangible indication of jury confusion.'" Macchia, 253 N.J. at 257 (quoting State v. Gandhi, 201 N.J. 161, 193 (2010)).

"[I]n cases where there is a danger of a fragmented verdict the trial court must upon request offer a specific unanimity instruction." Frisby, 174 N.J. at 597-98 (quoting Parker, 124 N.J. at 637). When the defendant failed at trial to request a specific instruction, we "must determine whether the absence of a specific unanimity charge 'was clearly capable of producing an unjust result.'"

30

State v. Kane, 449 N.J. Super. 119, 141 (App. Div. 2017) (quoting Frisby, 174 N.J. at 598).

In Frisby, the court found a unanimity charge was required when the State had proffered two different theories in support of its child-endangerment charge: defendant had inflicted injuries on her son directly or by failing to properly supervise him or had abandoned him. Frisby, 174 N.J. at 598-599; see also Macchia, 253 N.J. at 258. "Because the State's two different theories were '"contradictory," "conceptually distinct," and not even "marginally related" to each other,' the Court held, a 'specific unanimity instruction' was required." Macchia, 253 N.J. at 258 (quoting Frisby, 174 N.J. at 600).

That is not the case here. The State presented one theory of liability regarding the child-endangerment charge, and it was based on what Declan had seen and done regarding the altercation between defendant and Nancy. Declan may have woken up when defendant arrived at the house, but he went back to sleep. Declan said nothing about defendant's drinking, drug use, or use of coarse language in his testimony. His testimony focused on what he saw and did regarding the altercation between defendant and Nancy. In her testimony, Nancy said nothing about defendant's drinking or drug use or use of coarse language in front of Declan. Her testimony with respect to Declan focused on

31

what Declan had witnessed and done with respect to her altercation with defendant. In her closing argument, the assistant prosecutor said nothing about defendant's drinking, drug use, or coarse language in discussing the child-endangerment charge. She focused on the altercation: "State submits that 9-1-1 call corroborates [Nancy's] story of being strangled, and also corroborates [Declan's] story of having to intervene to give his mom some air. And the State submits to you that that's endangering the welfare of [Declan]. That's endangering the welfare of a child."

Given the State's one theory of liability on child endangerment and the lack of evidence Declan was harmed in any other way, a fragmented verdict wasn't possible and the court had no reason to give more specific instructions as to the basis of the charge or unanimity and the absence of those more specific charges was not "clearly capable of producing an unjust result." Kane, 449 N.J. Super. at 141 (quoting Frisby, 174 N.J. at 598).

C.

Defendant argues we must vacate his sentence because the court erred in (1) finding aggravating factor eleven, (2) engaging in improper double counting in finding aggravating factor fourteen, (3) failing to set forth a sufficient basis

32

for finding aggravating factor nine, and (4) its Yarbough, 100 N.J. 627, and Torres, 246 N.J. 246, analysis in imposing consecutive sentences.

We review a trial court's sentencing decision under an abuse-of-discretion standard. State v. Konecny, 250 N.J. 321, 334 (2022). We do "not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). We apply the deferential standard so long as the sentencing court "follow[ed] the Code and the basic precepts that channel sentencing discretion." State v. Case, 220 N.J. 49, 65 (2014); see also Trinidad, 241 N.J. at 453. Thus, we affirm a sentence "unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Rivera, 249 N.J. 285, 297-98 (2021) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)); see also State v. Vanderee, 476 N.J. Super. 214, 235 (App. Div.), certif. denied, 255 N.J. 506 (2023). We remand for a resentencing if the trial court "fail[ed] to provide a qualitative analysis of the relevant sentencing factors on the record." Fuentes, 217 N.J. at 70.

The State concedes the court's consideration of aggravating factor eleven was improper but contends that error was harmless. We disagree and,

accordingly, vacate the sentence and remand the case for resentencing without consideration of aggravating factor eleven.

In discussing defendant's personal history along with its other considerations, the court provided an adequate explanation for its finding of aggravating factor nine. However, we are unable to glean from the court's decision whether the court engaged in improper double counting as to aggravating factor fourteen.

"Elements of a crime, including those that establish its grade, may not be used as aggravating factors for sentencing of that particular crime." State v. Lawless, 214 N.J. 594, 608 (2013); see also Fuentes, 217 N.J. at 74-75 (holding that sentencing courts "must scrupulously avoid 'double-counting' facts that establish the elements of the relevant offense"). "A court, however, does not engage in double-counting when it considers facts showing defendant did more than the minimum the State is required to prove to establish the elements of an offense." State v. A.T.C., 454 N.J. Super. 235, 254-55 (App. Div. 2018); see also Fuentes, 217 N.J. at 75 ("A sentencing court may consider 'aggravating facts showing that [a] defendant's behavior extended to the extreme reaches of the prohibited behavior.'" (alteration in original) (quoting State v. Henry, 418 N.J. Super. 481, 495 (Law Div. 2010))); see A.T.C., 454 N.J. Super. at 254-55;

see also State v. Taylor, 226 N.J. Super. 441, 453 (App. Div. 1988) (the court properly considered a four-year-old sexual assault victim's "extreme youth" in applying aggravating factor fourteen when the statute already covered victims under thirteen years old).

The judgment of conviction does not reference aggravating factor fourteen. At the sentencing hearing, however, the court stated, "there is also aggravating factor number fourteen, in that there's an act of domestic violence that the court has considered." On remand, we direct the court to state clearly whether it finds aggravating factor fourteen and, if so, the court shall make findings of fact and conclusions of law supporting its finding and weighing of the factor and explain how it found the factor without engaging in improper double counting.

At the sentencing hearing, the court provided some, albeit limited, analysis of the Yarbough factors to explain its decision to impose consecutive sentences. It did not give "[a]n explicit statement, explaining the overall fairness of [the] sentence," which "is essential to a proper Yarbough sentencing assessment." Torres, 246 N.J. at 268. That omission is particularly glaring when the court imposed a twenty-four-year aggregate prison term based on an extended term sentence and multiple consecutive sentences. On remand, we

35

direct the court to provide a thorough <u>Yarbough</u> analysis, including a statement regarding the overall fairness of the sentence.

Affirmed as to the convictions; vacated as to the sentence; remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2846-21